528 So.2d 707 (1988)
A. COPELAND ENTERPRISES, INC., d/b/a Popeye's Famous Fried Chicken & Biscuits, Inc., d/b/a New Orleans Spice Company
v.
HARIMAW, INC.
No. 88-CA-22.
Court of Appeal of Louisiana, Fifth Circuit.
May 16, 1988.
Writ Denied October 7, 1988.
*708 Aubrey B. Hirsch, Jr., Peter J. Butler, Butler, Heebe & Hirsch, New Orleans, for plaintiff-appellant, A. Copeland Enterprises, Inc.
Francis P. Accardo, James B. Irwin, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, for defendant-appellee, Harimaw, Inc.
Before KLIEBERT, BOWES and GRISBAUM, JJ.
BOWES, Judge.
Plaintiff, A. Copeland Enterprises, Inc. (hereinafter ACE), appeals a judgment of the District Court in its favor in the amount of $15,000, against Harimaw, Inc. (hereinafter Harimaw). ACE disputes the amount of that judgment, contending that it is insufficient to recompense it for expenses incurred in repairing the building in question; ACE also appeals the denial of the trial court of attorney's fees. We revise the judgment, and, as revised, affirm the main award made, but remand for additional evidence regarding attorney fees.
ACE is engaged in the fast food chicken business, marketing "Popeye's" chicken through nationwide franchises. New Orleans Spice Company (hereinafter "Spice Plant") is a division of ACE, chiefly involved in the preparation and supply of the proprietary spices and batter mixes which are unique to the ACE products. ACE also owns several "Copeland's Restaurants" in the area, all of which receive their food-product supply from a central commissary in the New Orleans region (hereinafter this portion of the business will be referred to as the "Commissary").
In 1984, both the Spice Plant and the Commissary divisions of ACE were in need of relocation to larger quarters. Miles Parker, the director of the Spice Plant, contacted Ed Carlson, affiliated with the real estate division of ACE, to request that he locate suitable property. A building under construction situated at 1000 Harimaw Court East in Jefferson Parish became the focus of ACE's and Carlson's search. The property was owned by Harimaw, Inc., which was constructing the building through its contractor, National Lumber Company, and Louis Haeuser was president. The building initially was intended by Harimaw to be leased rather than sold. However, in April, 1984, an agreement was reached between Harimaw and ACE wherein Harimaw accepted ACE's offer of $850,000 to purchase the property subject to Harimaw completing construction of the "shell" building in accordance with the (then-existing) plans and specifications.
*709 The sale was completed and executed on September 13, 1984.
ACE had determined to use the southern half of the structure for the Spice Plant and the other half for the Commissary. ACE completed the Spice Plant side of the building and the Spice Plant became operational. Shortly thereafter, ACE undertook modifications to the northern portion of the building, which was designated for the Commissary. The work began on January 1, 1985.
Hope Enterprises (hereinafter Hope) was the general contractor for this portion of the job. Boes Iron Works (hereinafter Boesand of no relation to the writer of this opinion) was the subcontractor hired to perform miscellaneous steel work on the project. In the third week of January, ACE claims it discovered for the first time (a fact disputed by Harimaw) that the trusses which constituted the steel structure of the building were some fifty years old. ACE also contends they were heavily rusted, but painted over, with corrosion present. Manny Soto, president of Hope, immediately notified ACE's architect, Thomas Harang, of the problem. Harang retained a structural engineer, Walter Zehner, to examine the structure. On January 18, 1985, Messrs. Soto, Zehner, Harang and Hank Smith (formerly the partner of Harang) met to inspect the trusses. It was decided that no further work should be done until the trusses were analyzed and any problems corrected. On January 23, Zehner advised Harang that the existing roof trusses did not have sufficient structural strength to carry the existing roof loads, not including any new loads which would be caused by the addition of mechanical equipment. The letter continued:
"Also, several of the trusses have rusted badly reducing the effective section sizes which has resulted in a possible dangerous situation. It is strongly recommended that no work be done in the roof area until this situation is rectified."
Time, at this point, became a problem. The old location of the Commissary had to be vacated by March 1, 1985 by order of the Jefferson Parish Council (there were several parish and state zoning and health ordinances involved). Furthermore, the Spice Plant, which had already moved into its half of the building, could maintain only a two-week supply of its products because of their perishable nature. The Spice Plant would have to be closed, not only to enable the repair work to be completed, but because of the possible danger referred to in Zehner's letter. The work, therefore, had to be completed in an abbreviated period of time, with time being, literally, of the essence. Considering this obvious fact, we find it strange that ACE had not yet notified Harimaw of their findings when they obviously intended to get Harimaw to replace or repair the trusses and/or hold them liable for the cost and delayed doing so until February 7th.
Zehner was requested to devise a plan to correct the problem with the trusses and, on February 1st, those designs were reviewed by Messrs. Harang, Parker and Soto. Three bids were obtained by subcontractors to install steel beams underneath each truss, which was the method chosen to correct the problem. Of the three bids, only one, that of Boes Iron Works, met the time deadlines required by ACE.
On February 7th, ACE advised Harimaw, through its president and owner, Louis Haeuser, of the problem by a hand-delivered letter, which generally described the proposed repairs and costs thereof, and demanded that immediate action, within the next twenty-four hours, be taken to correct the problems. Harimaw's response was instantaneous. That same afternoon of February 7th, Louis Haeuser, his son and business associate Dan Haeuser, and Tom Gilbert, Harimaw's architect, inspected the property and, the next morning, returned with an engineer, an architect, and a photographer. The engineer, Gabriel Masson, felt that it was necessary to inspect each truss individually, and began doing this. Even so, on February 8th, Harimaw, through its counsel, replied to the demand by a letter to ACE, also hand-delivered, to Parker, denying the charges that the trusses were defective with one exception:

*710 "One truss needs reinforcement, a fact which Mr. Haeuser learned at 1:00 p.m. today, when he inspected the premises involved. He is ready, willing and able to reinforce the truss promptly."
Upon receipt of the letter from Haeuser on February 8th, and without further delay or negotiation, ACE began immediately its own installation of the supporting steel beams, in accordance with Zehner's plans. However, in a letter dated the next day, February 9th, Haeuser's counsel notified ACE that Haeuser had just received Zehner's report, which was not furnished him until he specifically requested it; that Zehner's report was being furnished to Haeuser's engineer, who was going to start immediately on a field survey of each truss beginning Monday, February 11th, and that "our client is ready, willing and able to do what is required promptly." The letter also warned ACE "that any work that you may do is without our client's permission, is at your expense and risk, and is without any liability to our client." Despite this offer and warning, ACE proceeded with its own undertaking of repairs, full speed ahead, with no apparent concessions to or regard for the impending survey of Haeuser's engineer. The repair work on the Commissary side of the building was completed on February 11th; the repairs on the Spice Plant side were completed on February 17th. Because of certain design problems, the "I" beams on the Commissary side could not be utilized on the Spice Plant side, and the engineer felt that the only alternative was to fabricate and install new trusses in that area. The costs of all the repairs and replacements totalled $305,406.00.
Suit in redhibition for these damages was filed on June 12, 1985. Besides the costs of repair, ACE prayed for payroll costs incurred as a result of construction, damages for delay in relocation of the commissary facility, architectural and engineering fees, and attorney's fees of $5,000.00.
Following a trial on the merits, the district court granted judgment in favor of ACE in the amount of $15,000, but no attorney fees were awarded.
On appeal, ACE urges that the trial court erred in failing to apply Louisiana Civil Code Article 2545, infra, to govern the recovery by ACE; in failing to award recovery of damages directly caused by Harimaw's breach of warranty; in allowing the testimony of Craig Boes, of Boes Iron Works, and in relying on certain of his testimony which was hearsay; and, finally, in failing to award ACE reasonable attorney's fees pursuant to LSA Article 2545.
Louisiana Civil Code Article 2545 states:
The seller, who knows the vice of the thing he sells and omits to declare it, besides the restitution of price and repayment of the expenses, including reasonable attorneys' fees, is answerable to the buyer in damages.
Appellee contends that the representatives of ACE were fully aware that the trusses in question were used and were some 50 years old, having been so informed by Haeuser prior to purchasing the building. Therefore, appellee avers that the redhibitory action is barred by Article 2522, which reads:
The buyer can not institute the redhibitory action, on account of the latent defects which the seller has declared to him before or at the time of the sale. Testimonial proof of this declaration may be received.
At trial, Haeuser testified that he informed both Parker and Copeland himself that the structural trusses in the building were previously used, having been obtained from a river warehouse some six or seven years prior to construction. He also stated that on two occasions when Parker, and then Copeland himself, visited the construction site prior to the sale, some of the used trusses were lying on the ground, plainly visible. Parker denied any such communication and Copeland was not called as a witness at the trial (a fact which does not help appellant's case). On this issue, the trial judge, in his reasons for judgment, apparently believed Haeuser's testimony when he stated:
"Initially the Court concludes that there was no misrepresentation or concealment by the seller. The plaintiff *711 through its officer, real state [sic] agent and architect were aware of what was being purchased, a shell building; erected in accordance with plans and specifications of the seller."
We interpret this to mean that the trial judge believed that Haeuser did notify ACE that the trusses utilized in construction were previously used ones. This is a perfectly reasonable evaluation of credibility by the trial judge which should not be disturbed on review absent manifest error, which we do not find. Canter v. Koehring Company, 283 So.2d 716 (La.1973). However, we find that even if ACE had knowledge that the trusses were used, this fact is not dispositive of the issue.
This court has previously held, in accord with all other appellate courts of this state, that a builder-vendor is presumed to know of the defects of the building itself. Verbick v. R.G.C. Investments, Inc., 477 So.2d 858 (La.App. 5 Cir.1985). Therefore, the purchasers in an action for redhibition or reduction, if successful, are entitled, in addition to a diminution in price, to damages and attorney's fees. Verbick, supra; Smith v. H.J. Landreneau Bldg. Contractor, 426 So.2d 1360 (La.App. 3 Cir. 1983).
A seller is in good faith if he did not know of the vices of the thing. Since a manufacturer is presumed to know the vices of the thing he sells, he can never be in good faith if a defect in fact exists. Burns v. Lamar-Lane Chevrolet, Inc., 354 So.2d 620 (La.App. 1 Cir.1977).
Associates Financial Services Co. v. Ryan, 382 So.2d 215 (La.App. 3 Cir.1980).
We do not find that C.C. Art. 2522 negates any claim of ACE under Art. 2545. Assuming, as the trial court did, that ACE had knowledge that used trusses were employed in the construction, ACE was still entitled to the general warranty that the building itself was fit for its intended purpose; and a steel structure which will not safely support the roof of a building obviously renders that structure unfit. The fact that a product, or in this case a component, is a used one does not negate such warranty.
"Even though the same warranties of fitness may not apply to old and new alike, the thing sold must still be fit for its intended purpose; if not an action in redhibition will be maintained." Weber v. Mathews, 367 So.2d 1326 (La.App. 4 Cir.1979). See also Verlander v. Hoffer, 351 So.2d 229 (La.App. 4 Cir.1977); Di Pietro v. LeBlanc, 68 So.2d 156 (La.App. 1 Cir.1953).
In Buck v. Adams, 446 So.2d 895 (La. App. 1 Cir.1984), the court considered defendant's claim that plaintiff's redhibitory action was barred by Article 2522. There, the defendant averred that he had told plaintiff of worm holes in the bottom of the boat. The court found that although the worm holes were the cause of the boat's unseaworthiness, it was the unseaworthiness that was the redhibitory defect:
"Albeit the worm holes are the cause thereof, the record reflects that it is possible to have a seaworthy vessel with worm holes. Defendant's mention of the worm holes to plaintiff is of little importance since the crucial disclosure is the seaworthiness of the vessel."
We agree with this reasoning of the First Circuit that the disclosure of an imperfection is not necessarily the key issue, but rather the vice that constitutes a redhibitory defect is one that renders the thing absolutely useless or so imperfect and inconvenient that it must be supposed that the buyer would not have purchased it had he known of the vice. Therefore, just as a buyer would not have knowingly purchased an unseaworthy boat, it must be assumed that a buyer would not purchase a structurally unsound building, especially if those structural defects created a potentially dangerous situation.
It was not sufficient for Haeuser to disclose that the trusses were either old or used, since he insisted that not only was the building itself sound, but that the trusses were as good as, or even superior to, new trusses currently being manufactured. The deterioration of the trusses proven in the record evidences the error of this warranty.
*712 Further, the violation of the Jefferson Parish Building Code, contrary to the position taken by the trial court and the defendant, is indeed relevant to the case before us. The jurisprudence appears to be established to the effect that where a government ordinance mandates certain regulations to be followed, the purchaser is entitled to assume these laws have been complied with; and failure to so comply renders the vendor liable for the cost of making physical corrections which are made necessary because of governmental or quasi-governmental regulations in effect before the agreement to purchase was entered into. Deshotel v. Higgins, 109 So.2d 805 (La.App.Orl.1959); Rodriguez v. Hudson, 79 So.2d 578 (La.App.Orl.1955). We find this rationale to be entirely reasonable and appropriate.
Here, ACE was certainly entitled to assume that the building which it purchased met the requirements of the Jefferson Parish Ordinances for carrying a "live load." ACE was obviously obliged to correct the substantial capacity of the load bearing trusses in order to bring itself within the codal requirements, since failure to do so would have rendered it noncompliant. Therefore, it was necessary for ACE to make the structural changes required to have the building conform to the pertinent governmental codal requirements. These changes are obligations which should have been performed by Harimaw, if given a fair chance by ACE to do so. Therefore, in any event, Harimaw is liable for the reasonable and actual costs of making such changes or reinforcementsbut only to the extent necessary to conform to codal requirements.
Accordingly, despite the erroneous arguments of defendant in brief, we find that Article 2545 is indeed the applicable statute in the present case.
The testimony in the case established that prior to erecting the building, Harimaw sandblasted and twice painted the trusses so that the age and condition of the trusses apparently would not have been obvious upon simple inspection. Furthermore, the areas which had badly deteriorated were near the roof area, and were discovered only after workmen on scaffolds attempted some modifications. The defect was not discoverable by simple inspection and, despite the finding of the trial court that ACE was advised that the trusses were used ones, this finding does not absolve the vendor inasmuch as "used" is not equivalent to "defective" or substandard.
The trial court heard testimony from two expert witnesses on the issue of the extent of repairs to make the building structurally sound. Zehner, who was ACE's structural engineer, testified that when looking at the trusses, there was quite a lot of pitting and that rust had completely eaten through parts of some members of the trusses. While he examined all the trusses, he did not perform a member by member, truss by truss, analysis. Zehner asked Soto to perform certain measurements on the trusses. Then, Zehner analyzed what he considered to be three members per truss (out of a total of twenty-two members in each truss). This was done, by calculations, to determine the load-carrying capacity of each truss. Zehner concluded that, overall, the trusses were not strong enough to carry the required loads. The trusses should have been designed to carry a total of 28 pounds per square foot, according to the Jefferson Parish Building Code, whereas, in Zehner's opinion, two of the trusses could carry only 14 to 18 pounds per square foot. Zehner also found that the building had a design defect, based on the original architectural plans (which he said showed that the structure as designed could not resist the required loads). We find this a strange complaint since the record reveals that ACE bought the building while under construction, had its architect inspect it while being constructed, and saw and examined its plans and specifications prior to purchase. Zehner also said there existed defects in some of the members, discussed above, due to rusting and deterioration. Of the bolts and rivets, Zehner said that the heads showed "severe" rust, and that he was concerned that if any bolts had rusted on the inside "you could have a catastrophic failure of the truss."
Zehner proposed two solutions. One was to install new trusses alongside the existing *713 ones to relieve the load. This would have been less economical and more time consuming than the alternate plan, which was ultimately adopted. That plan was to install steel beams underneath each truss to relieve the load. Ultimately, because of space clearance problems, new trusses were installed on the Spice Plant side of the building. Zehner was not confident in the trusses based on their deteriorated condition. Providing some repair to them was "just like putting a patch on an old pair of blue jeans." Zehner did state on cross-examination that, assuming the trusses were in good condition, "beefing up" certain members would have remedied the design problems, and would even have complied with the building code. However, Zehner was emphatic that the problem was serious and even "beefing up" the angle members would not have totally resolved the problem "because with the amount of rust it was impossible to really tell how secure the structure would have been." Replacement of the angle members would not have, in Zehner's opinion, satisfied the member defectsthe members were still rusty and deteriorated.
Gabriel Masson, also a structural engineer, was retained by Harimaw to evaluate the situation. Masson went to the building on the morning of February 8th and looked at some trusses, noting one in particular that was seriously flawed. Beginning the following Monday, February 11th, Masson and his employees began a truss by truss analysis, using a micrometer to check for deterioration, and to check the trusses for size and connections. They were only able to inspect six trusses of the sixteen in the building, mainly because the inspection was so time-consuming (it took three days to inspect six trusses), and ACE's contractors had already begun to repair the others. We recall here that ACE only gave Harimaw approximately 24 hours notice to check into and repair any defects found.
Masson concluded that some diagonal members did not meet code requirements; of the six trusses examined, two were of a structural concern, being extensively deteriorated. Masson's proposed solution would have been to remove the defective angles and shore up and replace the angles for the distance which they were deteriorated. It would have taken eight to ten days to complete this analysis of the trusses and the deteriorated members. Extrapolating from the six trusses actually examined, Masson estimated that that the work could have been completed for a sum of between $10,000 and $15,000. Masson testified that these repairs would have brought the building within compliance with the Code.
In its reasons for judgment, the trial judge unqualifiedly accepted Masson's expert opinion that the necessary repairs could have been accomplished for $15,000, and would have rendered the structure both sound and acceptable under the Jefferson Parish Building Code. The repairs actually effected by ACE were characterized by the court as "a precipitous overreaction to a defect which resulted in unnecessary and costly repairs." The court also found:
All evidence in the case, including plaintiff's own expert engineer [Zehner], preponderates the conclusion by the Court that plaintiff seeks to burden defendant not only with the cost of correcting the defects, but the exaggerated cost of an undertaking not justified by the facts. The Court infers from the evidence that plaintiff was prepared and did prepare to engage in the costly project through its contractor, architect, engineer, attorneys and management, from its initial discovery of the defects in the structural steel on January 18, 1985.
By these words, the court obviously rejected the opinion of Walter Zehner, appellant's expert engineer.
We cannot say that the findings of the trial court as to these facts and his belief in the correctness of one expert opinion over the other are clearly wrong or manifestly erroneous. The law is well settled that, where the testimony of expert witnesses differs, it is largely a matter of fact for the trier of fact, who has great discretion in such matters, to determine the most credible evidence, and a finding of *714 fact in this regard will not be overturned unless manifest error appears in the record. Agr. Equipment Co., Inc. v. Rozas, 488 So.2d 241 (La.App. 3 Cir.1986); Nailor v. International Harvester Co., 430 So.2d 784 (La.App. 5 Cir.1983).
Both experts seemed equally qualified and the court's reliance on the testimony of Masson was a proper exercise of its discretion. We find no manifest error here.
As to appellant's position that the testimony of Craig Boes should not have been admitted, we find little merit in this contention because appellant itself had subpoenaed Mickey Boes (father of Craig and owner of Boes Iron Works) as a representative of Boes Iron Works, yet had chosen not to call him as a witness; Craig Boes was the actual supervisor on the job in question and obviously knew more about what took place. In view of these facts, and the fact that Boes is the plaintiff's own contractor, we cannot find any merit in their claim that they were surprised by and unprepared to deal with the testimony of Craig Boes.
While the trial judge did express some surprise over Craig's testimony, such does not appear to have been the basis of his findings, but rather his judgment appears to have been grounded in the testimony of the other witnesses (and particularly that of Masson), as well as the important documentary evidence.
The evidence and testimony established that the defect in the trusses became known to ACE and its employees on January 18, 1985; by January 23rd, Zehner had analyzed the problem as serious and, by February 1st, had submitted a plan or design to correct it. Between February 1st and February 7, 1985, bids were sought and, on February 7th, the day of ACE's initial notice to Harimaw, a change order for the contract had been drawn up and submitted to Soto and Hope Enterprises. The change order was accepted and repairs commenced on February 8th. By the time Harimaw's expert could begin a detailed inspection, repairs had been almost completed on one side of the building. If Masson was unable to complete his analysis of the trusses, it was caused primarily by the expedited and secretive actions of ACE in preparing for more than two weeks to set extensive repairs and reinforcements in motion, and then giving Harimaw only twenty-four hours to assess the situation and to effect those repairs, and there is no dispute about these facts.
The jurisprudence is settled and logic dictates that a purchaser may not recover for repairs which encompass work for more than what is necessary to repair the defects and make the structure in question sound. Webb v. Hughes, 408 So.2d 1183 (La.App. 4 Cir.1982); Neal v. Saizan, 486 So.2d 832 (La.App. 1 Cir.1986). Because the trial court properly relied on Masson's opinion, and because we find no manifest error in the findings of the trial judge, we affirm the judgment of the trial court insofar as it awarded appellant $15,000 for the costs of repairs.
However, the suit was properly brought under C.C. Art. 2545, as explicated hereinabove, and, therefore, appellant is entitled to damages, expenses and reasonable attorney fees. It is clear that the situation with the defective trusses was potentially dangerous, even in the opinion of Masson. It was also necessary to clear the building in order to permit the necessary repair work to be done, and this appears to be so whether Zehner's or Masson's repairs would have been made. We agree with ACE's contention that it was necessary to close the Spice Plant for two weeks during repairs; ACE paid its employees during that time and also for overtime necessary to replenish the spice inventory when the employees were able to return to work. The spice already blended in stock continued to be shipped during the period the plant was closed and there was no loss of sales claimed or suffered. The product inventory that had been on hand in the Harimaw Court building had to be removed to another location for shipment during this period to prevent entry and re-entry into the building until the repairs were completed. Testimony and exhibits produced at trial evidenced that extra payroll *715 costs, necessitated by the repairs forcing closure of the building, totalled $6,749.44. The cost to transport the spices from the shutdown plant to another facility for shipping to various outlets was shown to be $631.00, which included truck rental, plus fuel. Appellant is entitled to be reimbursed these necessary expenses.
Appellant is also entitled to attorney fees under Article 2545. We note that, in the petition, ACE alleged that it had incurred attorney fees in the amount of $5,000; However, ACE went on to request in its prayer "reasonable attorney's fees for the preparation and prosecution of this suit." The trial judge denied plaintiff's attempt to introduce into evidence an exhibit which purported to show attorney's fees expended by appellant, on the basis that the attorney's fees claimed was only $5,000.00. The court also refused to allow plaintiff to offer a proffer of evidence of attorney fees expended by them. This was error on the trial court's part in both instances. It was also error for the trial court to deny any attorney fees to appellant whose cause of action arose under Article 2545 and in which defendant is in presumptive bad faith. Verbick, supra; Saad v. Anderson, 416 So.2d 188 (La.App. 1 Cir.1982); Chastant v. SBS-Harolyn Park Venture, 510 So.2d 1341 (La.App. 3 Cir.1987).
We deem that it would be in the best interest of all parties if we remand the case to the trial court for the taking of evidence on reasonable attorney fees due appellant, since the only evidence in the record is counsel's statement in colloquy as to the amount paid by ACE. This hearsay and unsupported evidence alone is certainly not sufficient for this court to make a proper judgment on this issue. Appellant has also requested an additional award of attorney fees on appeal, and, since it has been partially successful in this court, we find that an additional $1,500 would be a fair amount to compensate ACE for attorney fees incurred in this appeal.
Finally, we find that the fees for architectural services for Harang is an appropriate element of damages. It appears clear that ACE was entitled to consult its architect when the structural problems became evident, in order to ensure the safety and integrity of its structure. The fact that the ultimate plan conceived by Harang's consultant, Zehner, has been found to be excessively corrective and calls for over-improvement does not diminish what was ACE's right to ascertain the nature of, and attempt correction of the defect, by consultation with its architect. In the same vein, an award for Zehner's fee is also an appropriate element of damages in the present case because ACE was entitled to get the opinion of its own engineer after defects were discovered.
For the foregoing reasons, judgment in favor of ACE and against Harimaw, Inc. is revised to grant judgment in favor of ACE for the following amounts, with legal interest thereon from date of judicial demand:

Costs of repairs to building $15,000.00
Payroll costs and overtime 6,749.44
 necessitated
Architectural fees (Thomas 600.00
 Harang)
Engineer's fee (Walter Zehner) 1,500.00
Transportation expenses 631.00
 __________
 TOTAL DAMAGES AND $24,480.44
 EXPENSES TO BE
 AWARDED

The case is remanded to the trial court for the taking of evidence and determination of reasonable attorney fees for the prosecution of this case. An additional award of $1,500.00 is granted by this court as attorney's fees due to appellant for prosecution of this appeal. Costs of the appeal are to be equally divided between the parties.
REVISED, AND, AS REVISED, AFFIRMED, AND REMANDED FOR ADDITIONAL EVIDENCE.