608 So.2d 1100 (1992)
Warren DeSAMBOURG, et al.
v.
BOARD OF COMMISSIONERS FOR THE GRAND PRAIRIE LEVEE DISTRICT.
Albert L. SCHELL, Jr., et al.
v.
BOARD OF COMMISSIONERS FOR THE GRAND PRAIRIE LEVEE DISTRICT.
Sadie PERINO, et al.
v.
BOARD OF COMMISSIONERS FOR THE GRAND PRAIRIE LEVEE DISTRICT.
Charles MANCUSO, et al.
v.
BOARD OF COMMISSIONERS FOR THE GRAND PRAIRIE LEVEE DISTRICT.
Joseph SEIBERT, Sr., et al.
v.
BOARD OF COMMISSIONERS FOR THE GRAND PRAIRIE LEVEE DISTRICT.
Marie Elena Melerine, Wife of/and Anthony LA GRECO, Jr.
v.
PLAQUEMINES PARISH GOVERNMENT.
Salvadore DI CARLO
v.
PLAQUEMINES PARISH GOVERNMENT.
Emile LA GRECO
v.
PLAQUEMINES PARISH GOVERNMENT.
Joseph LA GRECO
v.
PLAQUEMINES PARISH GOVERNMENT.
Henry G. HEIER
v.
PLAQUEMINES PARISH GOVERNMENT.
Nos. 91-CA-2104 to 91-CA-2113.
Court of Appeal of Louisiana, Fourth Circuit.
November 13, 1992.
Rehearing Denied December 16, 1992.
*1101 Mack E. Barham, Robert E. Arceneaux, Matthew K. Brown, Barham & Arceneaux, New Orleans, for appellants.
Normand F. Pizza, M. Allyn Stroud, Brook, Morial, Cassibry, Pizza & Adcock, New Orleans, for appellee.
Before CIACCIO, WARD and ARMSTRONG, JJ.
CIACCIO, Judge.
In these consolidated cases, the plaintiff landowners appeal a trial court judgment dismissing their suits against the defendants, The Board of Commissioners for the Grand Prairie Levee District and Plaquemines Parish Government. We affirm.
The trial judge, in well-worded reasons for judgment, set forth the facts of this case, the issue in dispute, the applicable law and its historical development. His reasons for judgment are as follows:
Eleven consolidated suits form the basis of claims by various riparian owners of lands located along the Mississippi River in Plaquemines Parish. The plaintiffs contend that they are entitled to compensation for the taking of their property for levee purposes. The defendant, Plaquemines Parish Government ("PPG"), contends that it is not liable to pay compensation because the plaintiffs' land lies between the levee and the river and is "batture" and, consequently, under the provisions of the Louisiana Constitution of 1974 and state statutes is exempt from the ordinary requirement that the payment of compensation is due when the property is appropriated by public authorities for levee improvement purposes. The issue thus presented is: What is the scope of the batture exemption and its application to the facts of the case here under consideration.
Pursuant to the Mississippi River Flood Control Act of 1928, 33 U.S.C. Sec. 701-09, the United States Corps of Engineers ("COE") oversees and maintains the Mississippi River and levee system in Plaquemines Parish. Improvements to or enlargements of the levees are initiated and supervised by the COE in cooperation with the PPG. Once the COE selects the site to improve the levee, the PPC is then obligated to furnish all needed rights of way and *1102 to appropriate[1] riparian property for these purposes.

FACTS
The land in question known as "Shingle Point" consists of approximately fifty acres lying between the edge of the Mississippi River and the levee on the left descending bank of the river at English turn. There are no buildings on Shingle Point, and there has been no agricultural activity carried on in recent history. The alluvial buildup of the river at this point has served as a mining operation for dirt for levee development during the past 100 years or so. At the conclusion of the trial on March 22, 1991, the Court inspected the site. The river was at high water and, except for the upriver end of the tract, very little but willow trees were exposed above the river's waters.
Two levee projects initiated by the United States Corps of Engineers prompted action by PPG to appropriate subject properties. These projects have been described as the Scarsdale-Stella Levee Set Back and Road Relocation Project ("Scarsdale") and the English Turn Levee Enlargement and Concrete Slope Pavement Project ("English Turn").
With respect to the Scarsdale project, the PPG adopted resolutions dated March 3, 1982, July 28, 1982 and June 15, 1988, wherein all of the lands reflected in a government survey were appropriated for the purpose of acquiring fill dirt for purposes of obtaining a temporary servitude of access and for the removal of the dirt on the plaintiffs' land between the river and the levee. The contract for work on the Scarsdale project was issued on September 29, 1983, and the project "was completed December 1984."[2] According to the Corps of Engineers documents,[3] the amounts of dirt used were as follows:

 Compacted fill 6,139.0 cubic yards
 Semi-compacted fill 153,208.0 yards
 Uncompacted fill 14,098.0 yards

This material was hauled 2.1 miles from the place where it was dug to the site of the improvements to the levee. Most all of the dirt was removed from the properties of Schell, deSambourg, Seibert, Perino and Mancuso, and suits by these landowners followed and are referred to as the "deSambourg" suits.
With regard to the English Turn project, the property used was appropriated by resolutions of the Parish Council on January 8, 1986, June 11, 1986, November 12, 1987, and April 14, 1988. Again, the parish appropriated a temporary servitude to facilitate the removal of dirt, and the right of access on the plaintiffs' lands between the levee and the river.
The contract for the English Turn project was dated September 28, 1986, and according to PPG's affidavit, the project "was completed in December 1988." The amount of dirt used for this project is as follows:

 Semi-compacted fill 156,507.57 yards
 Uncompacted fill 6,846.00 yards

Much of the dirt in this project was removed from the DiCarlo, LaGreco and Heier/Himel tracts. Some dirt for the English Turn project may have been removed from the Schell, deSambourg and Seibert tracts.
The ownership of the tracts of the plaintiffs in the respective suits is listed as follows:

*1103
 Acreage
 Between
 River &
 OWNER Lot No. Arpents Levee
 Charles & Ina Miller 21 1 3.9
 Salvadore DiCarlo 20 1 4.1
 Joseph A. and 19A & 1 4.3
 Linda LaGreco 19B
 Anthony, Jr. and 18B 1 2.3
 Marie LaGreco
 Emile Charles 18A ½ 2.3
 LaGreco
 Henry J. and Erica H. 15-17 3 13.5
 Heier/Edward Himel
 Albert L. and Rosalie 11 1 4.7
 Schell
 Warren and Mary 10 1 4.6
 deSambourg
 Joseph P. Seibert 8 & 9 2 8.6
 Joseph, Sr. and 7B ½ 2.1
 Sadie Perino
 Charles and Angelina 7A ½ 2.1
 Mancuso

Following the filing of the respective suits, a Motion for Summary Judgment was filed by the PPG directed to the claim of Charles and Ina Miller in which it was contended that the servitude which was appropriated was not only not utilized by the defendant and its contractor, but that no dirt was removed from the Millers' tract. Since under LSA-R.S. 38:281(b), as amended by Act 676 of 1979, compensation is due for levee "appropriation" only where the lands and improvements are "... actually used, damaged or destroyed ...", there is no basis for recovery of compensation, where as in this instance, the servitude was not exercised. For this reason, the motion for summary judgment was granted and the Millers' suit dismissed. (Emphasis supplied by Court.)

LAW
An examination of the historical development of the law with respect to the issues presented by the contention of the respective parties is necessary. Before the turn of the 18th century, owners of land located along the Mississippi River began to commence construction of levees to protect their lands from the seasonal ravages of flooding. There was no reimbursement from the state for their expense in making these improvements. However, the burden proved to be too great and the levee districts were created in the late 1800's to construct and maintain the levees in each of their respective levee districts. See Constitution of 1879, Arts. 213-15; La.Acts 1879, No. 33 and La.Acts 1882, No. 10. The creation of the levee districts free the landowners of the obligation of constructing their levees, but it did not free their land from the riparian levee servitude which was created in Article 13 of the Civil Code of 1808 and continued through Article 661 of the Code of 1825 and the Code of 1870, now finally appearing in the 1977 revision of the property articles as Article 665. See 2 Yiannopolous Civil Law TreatiseProperty at 169 (2d Ed.1980).
Presently, Article 665 provides:
Servitudes imposed for the public or common utility, relate to the space which is to be left for the public use by the adjacent proprietors on the shores of navigable rivers, and for the making and repairing of levees, roads and other public or common works.

*1104 All that relates to this kind of servitude is determined by laws or particular regulations.
For the first time, Louisiana Constitution of 1898 imposed a requirement that lands appropriated by the Orleans Levee Board would have to pay for lands appropriated by them for levee purposes. Article 312 of the 1898 Constitution. This requirement was extended statewide by the Constitution of 1921. Article 16, Section 6 provided that all lands and improvements used or destroyed for levee purposes "shall be paid at a price not to exceed the assessed value of the preceding year, provided that this shall not apply to batture; ...."
The Constitution of 1974 made a significant adjustment of the levee servitude. Yiannopolous, supra, at 172. Article VI, Section 42 of the Louisiana Constitution of 1974 provides:
Notwithstanding any contrary provision of this Constitution, lands and improvements thereon hereafter actually used or destroyed for levee or levee drainage purposes shall be paid for as provided by law with the exception of batture or property the control of which is vested in the State as in a political subdivision for the purposes of commerce.
This section authorized the Legislature to provide a method of payment for property used or destroyed for levee purposes. The previous limitation on compensation (the assessed value for the preceding year) was continued in effect as a statute by La. Const. Art. XIV, Sec. 16 (1974) subject to change by law. Board of Com'rs v. Percle, 535 So.2d 1240 (La.App. 3rd Cir.1988).
The Legislature thereafter implemented the constitutional provision with respect to compensation to be paid to owners of riparian lands by enacting Act 314 of 1978 by changing the measure of payment from assessed value to fair market value. More specifically, Act 785 of 1985, now contained in LSA-R.S. 38:301(C)(1)(a) declares:
All lands, exclusive of batture, and improvements hereinafter actually taken, used, damaged, or destroyed for levee or levee drainage purposes shall be paid for at fair market value to the full extent of the loss.
Although the riparian landowner still owes the legal servitude of Civil Code article 665, the public (i.e. state, levee board) can no longer exercise that servitude without payment of just compensation which is fair market value. Tenneco Oil Co. v. Board of Com'rs, 567 So.2d 113 (La.App. 4th Cir. 1990). But, it must be observed that the legislature maintained the 1974 constitutional provision by exempting "batture" from the mandate to compensate the landowner.

BATTURE
That the lands appropriated are batture and exempt from the payment of compensation is the heart of the PPG's defense to plaintiffs' claims. The term "batture" is not defined by the Louisiana Constitution of 1974, but Acts 1979, No. 676 provided that "Batture" as used in this section shall have the same meaning as that term was defined by the courts of this state as of the effective date of the Louisiana Constitution of 1974," and La.R.S. 38:281(1) now contains an identical provision. In utilizing the term "batture" in the Louisiana Constitution of 1974, it is apparent to the writer that the delegates to the convention believed that "batture" included all of the land resting on the unprotected side of the levee and were unaware of the jurisprudence which reflected that some of those lands may not consist entirely of batture.[4] Transcript, La. Const. Conv. of 1973, Vol. VIII, 11/8/83, pp. 2205-2208.
In Boyce Cottonseed Oil Mfg. Co. v. Bd. of Comm'rs, 160 La. 727, 107 So. 506 (1926), the court provided a jurisprudential definition as follows:
The batture is that part of the river bed which is uncovered at the time of low water, but is covered annually at time of ordinary high water; when it ceases to be covered at the time of ordinary high water, it ceases to be batture and becomes the bank of the river.
*1105 Professor Yiannoupoulos in his Louisiana Civil Law Treatise, Vol. II, Sec. 57, observed that "For purposes of interpretation of Article 665 of the Louisiana Civil Code and Article 16, Section 6 of the Louisiana Constitution of 1921, the Louisiana Supreme Court has consistently defined batture as the area between ordinary low and ordinary high state of the water of a navigable river." Id. at 175. Professor Yiannoupoulos went on to say: "That is, of course, the definition of the natural bank of the river, as distinguished from the definition of the second paragraph of Article 457 of the 1870 Code. Thus levee boards were, and continue to be, bound to pay on indemnity for land between the ordinary high water mark and a levee actually used or destroyed for levee purposes." The definition thus supplied in Boyce, supra, leads to an inquiry as to what is the ordinary high water stage of a navigable stream and how is it determined.
The Louisiana Supreme Court in Wemple v. Eastham, 150 La. 247, 90 So. 637 (1922), declared the "ordinary high water stage" as being "the highest stage that it (the river) usually reaches at any season of the year...." However, the "ordinary high water mark does not necessarily encompass the peak flow or flood stage." Buttery [Buttrey] v. U.S., 575 [573] F.Supp. 283 (E.D.La.1983). Also Oklahoma v. Texas, 260 U.S. 626 [606] 43 S.Ct. 221, 67 L.Ed. 428 (1923).
The petitioners assert that the ordinary high water stage should be determined from the examination of the physical characteristics of the bank and, in some instances, where the physical characteristics are not clearly identifiable, resort should be made to examination of the types of vegetation which exist in a hydrographic environment. On the other hand, the defendant submits that ordinary high water state is the levee which restrains the river at its highest stage if the levee is in "proximity" to the river[5] and, if not, the stage should be determined by looking to the mean annual high water, which they submit exceeds the land elevation of Shingle Point. The foundation of plaintiffs' argument is centered more on federal regulations and jurisprudence, whereas the defendant's argument is primarily based on how the term is employed in Louisiana cases. The court will agree with PPG's assertion that the federal regulations define river bed and ordinary high water with respect to the federal government's navigational servitude which is different from the Louisiana cases which deal with the public's art. 665 servitude and the rights of the riparian landowner.
In making a determination as to what method would be proper, this court must resort to the guidelines established by the two cases, Wemple and Boyce, supra. Wemple, which has been consistently cited with approval by the Louisiana Supreme Court and by lower appellate courts, specifically identifies the ordinary high stage as being "the highest stage that the river usually reaches at any season of the year...." Webster defines "usual," among other things, as "found in ordinary practice or in the ordinary course of events." Webster's Ninth New Collegiate Dictionary, Merriam-Webster, Inc. (1983). Boyce, supra, utilizes the term "annually" in incorporating ordinary high water as the upper boundary of batture. In the court's opinion, it is more appropriate to employ a method which satisfies the terms of "ordinary" and "annually" by looking to statistics regarding the elevations the river usually reaches during approximately each year over a sufficient period of time in which to support a reasonable finding of what is the ordinary high water stage. This is not to say that the plaintiffs' argument and evidence is not without merit in fixing the limits of the river's action on its banks by use of bank profiles and vegetation studies. But the court believes that PPG's utilization of evidence relating to the mean high water for purposes of determining ordinary high water more properly conforms to the definition supplied and adhered to by the Louisiana Supreme Court over many years.
Essentially mean high water is derived from averaging the annual river stage peaks at a given location. Dr. Richard *1106 Kesel, a fluvial geomorphologist, calculated that the mean high water at Shingle Point of 11 feet will recur on an average of once every 1.5 years. This of course means that there is a 75 percent chance that the river will reach the mean high water level in any given year. This comports with definition of "the highest stage that the river usually reaches in any given season of the year." The overwhelming weight of the expert testimony supports a finding that at the time of the respective appropriations and some years before the mean high water at Shingle Point was 11.0 feet. Accordingly, the court adopts 11.0 feet as the ordinary high water stage.
With respect to the elevation of Shingle Point several years prior to the time the work on the borrow pits was first begun in 1984, the maximum elevation shown on Shingle Point on the Mississippi River Hydrographic Survey 1973-1975 was 10.8 feet. The other elevations shown are 10.2, 7.2, 9.3, 6.9, 7.7, 6.1, 8.7, 8.4, and 9.5, which reflect all elevations below the 11.0 feet mean annual high water or ordinary high water stage. Joint Exhibit 5. Immediately before the work was commenced, the Corps of Engineers recorded twenty-five elevations across the surface of Shingle Point and of these twenty-five elevations, only two exceeded 11.0 feet. The remaining elevations are as follows:
The remaining twenty-three elevations are as follows: 8.7, 8.9, 10.2, 8.2, 6.7, 8.7, 8.3, 11.0, 10.8, 9.6, 8.0, 10.5, 7.7, 5.5, 6.2, 8.2, 7.20, 8.10, 6.97, 9.2, 9.2, 9.3 and 8.0.
Based on this elevation data, Curtis Barrett, defendant's witness, testified that the surface of Shingle Point is 97 percent inundated when the water reaches the 11.0 stage.
He further testified that the only other areas not inundated appeared to be isolated high spots created by man-made activity. As pointed out earlier in this opinion, the court viewed Shingle Point at the conclusion of the trial when the river was at 8.5 level, and, with the exception of a few high spots on the up river portion, water covered the area with only the tops of trees rising above the waters. Dr. Kesel testified that, "mean high water, that we defined at roughly about eleven feet, covers the bar." (Shingle Point).
It is thus evident, that if mean high water is one and the same as the ordinary high water stage, all of Shingle Point is batture and, therefore, exempt from the payment of compensation under constitutional and statutory authority.
It is well settled than an appellate court must give great weight to the conclusions reached by the trier of fact, and if there is a conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed unless manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
In the instant case, both plaintiffs and defendants introduced testimony of several experts relevant to the issue of what is the ordinary high water mark of the Mississippi River. Dr. Luther F. Holloway testified on behalf of plaintiffs. Dr. Holloway, an expert in the field of plant pathology and botany, testified regarding the physical ordinary high water mark at Shingle Point. According to Dr. Holloway, in determining the ordinary high water mark the dominance of the stream on the bed bank profile in relation to the soils and vegetation along the bank during all periods of water flow must be observed. Holloway testified that determining the high water mark is not an averaging technique and that high water mark is usually seen because it is a very distinct physical phenomenon, as evidence by the break in vegetation on the river bank. He further stated that based on his observations there is a natural demarcation line or physically visible high water mark that extends across Shingle Point. While testifying, Dr. Holloway analyzed pertinent gauge data. He opined that occasions on which river elevations reached 11.0 feet at Shingle Point should be characterized as "high, high flood events."
Dr. Chester Watson, a member of the Civil Engineering Faculty at Colorado State University, testified as an expert in river hydrolics and sediment transport for the plaintiffs. Like Dr. Holloway, Dr. Watson *1107 testified that the most reliable way to determine the ordinary high water line of the river is to observe the physical evidence at the particular site. According to him, the physical fact evidence of a significant mark on the river bank integrates all of the flows of the river that occur during a specific period and not just the river flow at peak elevations. At trial Dr. Holloway testified that he used a transect, as did Dr. Holloway, when he examined the area at Shingle Point to determine the high water mark of the river. He characterized the visible mark across the surface at Shingle Point as a debris line whereas Dr. Holloway referred to it as an erosion line, but both agreed it was a clear delineation.
Also testifying for plaintiffs was Dr. William Patrick, Boyd Professor of Coastal Sciences at Louisiana State University. Dr. Patrick, testifying as an expert in soils, sediments, wetlands and riverine soils and sediments, testified regarding the use of sediment distribution to determine the ordinary high water line of the river. He stated that, generally, above a certain point on the bank, the sediments or the soils are stabilized because the water fails to rise to that level often enough to destabilize or scour out the soils. Consequently, plants and vegetation take root due to the sedimentation and this growth clearly delineates the river's ordinary high water stage from its low water stage. According to Dr. Patrick, four factors analyzed in determining where the river's ordinary high water stage. 1) the grain size distribution; 2) the soil's organic matter content; 3) the sediment layers; and, 4) the presence of leaves in between these layers. He further testified the characteristics of the zone above the ordinary high water line at English Turn were that the soil was stable, the grain size was finer, the plants were more stable to proliferate their roots throughout the zone and the organic matter content of the soil was high. Dr. Patrick stated that the vegetation and tree species found at Shingle Point do survive annual inundation by the river. He found that at English Turn the zone above the ordinary high water mark began at 8.6 elevation. Like Drs. Holloway and Watson, he also testified that the ordinary high water line was clearly visible by observing the physical characteristics of the area.
In refuting plaintiffs experts' testimony that the ordinary high water mark is best determined by observing the physical markings at Shingle Point, defendants' experts claimed it is more accurately determined by calculating the mean annual high of the river. Defense witness, Curtis Barrett, qualified as an expert hydrologist and civil engineer, testified that the mean annual high water, derived from averaging the annual river stage peaks at a given location is used by the United States Corps of Engineers as a variable to describe the normal upperbound of a river and its behavior. Dr. Richard Kesel, an expert in fluvial geomorphology and sediment transport testifying for the defendants, stated that while the term ordinary high water is not often used in the scientific literature and is considered a legal term, mean high water (the annual average high) is more often used in the technical realm.
Dr. Kesel testified extensively regarding his historical investigation of both land elevations and river stage elevations at Shingle Point. He characterized Shingle Point as a "point bar," which he defined as an accumulation of sediment on the inside of a meander bend. In analyzing the effects of the flow of the Mississippi River waters on the land surface of Shingle Point, Dr. Kesel testified that he studied several sources of information, including: historical maps prepared in connection with Mississippi River Commission hydrographic surveys in 1883, 1921, 1935, 1949-52, 1962, 1966 and 1975; aerial photographs of Shingle Point taken by the U.S. Government in various years between 1947 and 1989; and, river gauge data, compiled by the Corps of Engineers from Mississippi River gauges at Carrollton, Chalmette and Braithwaite. According to Dr. Kesel, based on his studies he concluded that the maximum land elevations at Shingle Point varied over time due to the action of the river depositing and removing sediments therefrom, and in more recent decades due to man-made activity. He further concluded that throughout *1108 recorded history, the annual high water elevations of the river exceeded the highest land elevations on Shingle Point. Both Dr. Kesel and Barrett testified at trial that they analyzed river gauge records and reached the conclusion that, on average, the highest stage that the river reaches at Shingle Point in any given year is approximately 11.0 ft. Based on elevational data, Barrett testified that over ninety-seven percent of the surface of Shingle Point is inundated when the river reaches the 11.0 feet stage. Like Barrett, Dr. Kesel testified that ninety-eight to ninety-nine percent of the surface is inundated when the river reaches the 11.0 feet stage and that the areas not inundated at this stage are isolated high spots created by man-made activity.
The law is well settled that where the testimony of expert witnesses differs, the trier of fact has great discretion in determining the credibility of the evidence, and a finding of fact in this regard will not be overturned unless clearly wrong. A. Copeland Enterprises v. Harimaw, Inc, 528 So.2d 707 (La.App. 5th Cir.1988), writ denied 531 So.2d 475 (La.1988). In the instant case both plaintiffs' and defendants' experts were equally qualified and the trial judge's reliance on the testimony of defendants' experts was a proper exercise of his discretion. After reviewing the record, we find the trial judge's findings of fact and conclusions of law are amply supported by the evidence. We find no error in his conclusion that all of Shingle Point was batture and, thus, exempt from the payment of compensation under constitutional and statutory authority.
Accordingly, the judgment of the trial court in favor of defendants dismissing plaintiffs' suits is affirmed.
AFFIRMED.
ARMSTRONG, J., respectfully dissents.
NOTES
[1] "Appropriation" is a term of legal designation, unique to Louisiana law and quite different from the commonly encountered concept of "expropriation." Appropriation is the governing authority's exercise of the levee servitude through the taking of riparian property for the purpose of building and/or repairing levees. Delaune v. City of Kenner, 550 So.2d 1386 (La. App. 5th Cir.1989), writ denied, 553 So.2d 475 (1989). The taking of property by eminent domain is termed "expropriation" in Louisiana as distinguished from "appropriation," the term applied to the taking of the riparian servitude. 40 T.L.R. 243. Actually, title to property does not change through appropriation.
[2] Affidavit of Paul Griffith, III, dated October 4, 1990, attached to a Motion for Summary Judgment and identified as Exhibit B.
[3] Stipulation of counsel for parties.
[4] Thus the constitution and R.S. 38:301 requires payment at fair market value for that portion of the bank taken which is not batture, Tenneco Oil Co., supra.
[5] (La.Civ.Code art. 456)