ANNE LOWENBURG, JUDITH LOWENBURG, WIFE OF AND TOM LOWENBURG, SARAH LOWMAN, JACK STOLIER, WILLIAM B. TAYLOR, III, M.D. AND BARBARA WEST

VERSUS

SEWERAGE & WATER BOARD OF NEW ORLEANS

\* NO. 2019-CA-0524

\* COURT OF APPEAL

\* FOURTH CIRCUIT

\* STATE OF LOUISIANA

\* \* \* \* \* \* \*

CONSOLIDATED WITH:

ARIYAN, INC. D/B/A DISCOUNT CORNER

VERSUS

SEWERAGE & WATER BOARD OF NEW ORLEANS

CONSOLIDATED WITH:

NO. 2019-CA-0525

CONSOLIDATED WITH:

K&B LOUISIANA CORPORATION D/B/A RITE AID CORPORATION

VERSUS

SEWERAGE AND WATER BOARD OF NEW ORLEANS

CONSOLIDATED WITH:

NO. 2019-CA-0526

CONSOLIDATED WITH:

M. LANGENSTEIN & SONS, INC., PRYTANIA LIQUOR STORE, INC., WEST PRYTANIA INC. D/B/A PRYTANIA MAIL SERVICE, BARBARA H. WEST, FINE ARTS MANAGEMENT, L.L.C. D/B/A PRYTANIA THEATRE, PASCAL'S MANALE RESTAURANT, INC., SUPERIOR SEAFOOD AND OYSTER BAR, L.L.C., SUPERIOR BAR & GRILL, INC., THE FRESH MARKET, INC., BRITISH ANTIQUES, L.L.C., BENNET POWELL AND THE MAGIC BOX,

CONSOLIDATED WITH:

NO. 2019-CA-0527

**LTD.**

**VERSUS**

**SEWERAGE & WATER BOARD
OF NEW ORLEANS**

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2016-00621, DIVISION "D"
Honorable Nakisha Ervin-Knott, Judge
* * * * * *
**Judge Regina Bartholomew-Woods**
* * * * * *
(Court composed of Judge Edwin A. Lombard, Judge Sandra Cabrina Jenkins,
Judge Regina Bartholomew-Woods)

Randall Alan Smith
Sarah Ann Lowman
L. Tiffany Hawkins
Mary Nell Bennett
SMITH & FAWER, L.L.C.
201 St. Charles Avenue, Suite 3702
New Orleans, LA 70170
        COUNSEL FOR PLAINTIFFS/APPELLEES

Craig B. Mitchell
Kiana M. Mitchell
Joseph B. Morton, III
Christopher D. Wilson
MITCHELL & ASSOCIATES, APLC
615 Baronne Street, Suite 300
New Orleans, LA 70113

Darryl Harrison
SEWERAGE & WATER BOARD
625 St. Joseph Street
New Orleans, LA 70165
        COUNSEL FOR DEFENDANT/APPELLANT

<mark>AMENDED, REMANDED,
MODIFIED AND RENDERED, AND
AFFIRMED AS AMENDED
JULY 29 , 2020</mark>

*RBW*

*EAL*

*SCJ*

This consolidated appeal arises from residential and commercial property damages and loss of use and enjoyment as a result of construction associated with drainage projects across uptown New Orleans, Louisiana.

## FACTUAL BACKGROUND

This consolidated appeal involves a group of homeowners, Plaintiffs-Appellees ("Lowenburg Appellees")[1] and a non-profit church with a daycare center Plaintiff-Appellee, Watson Memorial Spiritual Temple of Christ d/b/a Watson Memorial Teaching Ministries, ("Watson Appellee")[2] who claim that they, along with their properties, sustained various types of damages as a result of the construction of the Southeast Louisiana Urban Drainage Project (SELA Project).[3]

---

[1] Lowenburg Appellees consist exclusively of residential property owners who live within Jefferson II and include Dr. Josephine S. Brown; Nancy and Parke Ellis; Dr. Robert and Charlotte Link; Ross and Laurie McDiarmid; Jerry R. Osborne; Jack M. Stolier; Dr. William B. Taylor, III; Mark Hamrick; and Elio, Charlotte, and Benito Brancaforte.

[2] The trial court, in its reasons for judgment, referred to Watson Appellee as a commercial plaintiff.

1

This federally sponsored and funded project[4] involved the construction of multiple drainage canals and was carried out by the United States Army Corps of Engineers ("USACE") and Defendant-Appellant, Sewerage and Water Board ("Appellant"). On January 16, 2009, USACE entered into a project partnership agreement[5] with the Louisiana Coastal Protection and Restoration Authority ("LCPRA") to construct the drainage canals. Pursuant to the project partnership agreement, LCPRA and Appellant entered into a cooperative endeavor agreement. Appellant assumed LCRPA's contractual responsibilities and obligations in relation to the SELA project.[6] Further, through the cooperative endeavor agreement, Appellant indemnified the LCPRA, USACE, and its contractors. The trial court, in its final judgment, concluded that Appellant was the owner and controller of this construction project. Similarly, this Court, in *Holzenthal*, concluded that Appellant was the owner and the controller of the SELA project. *Holzenthal v. Sewerage & Water Bd. of New Orleans*, 2006-0796, p.8 (La. App. 4 Cir. 1/10/07); 950 So.2d 55, 62.

This project took place in seven (7) phases throughout uptown New Orleans, Louisiana: Claiborne I, Claiborne II, Jefferson I, Jefferson II, Napoleon II, Napoleon III, and Louisiana I;[7] the instant consolidated appeal involves two of the aforementioned phases, Jefferson II and Napoleon III. Lowenburg Appellees'

---

[3] The purpose of this project was to increase drainage capacity in order to withstand ten-year rainfall events. *Sewell v. Sewerage & Water Bd. of New Orleans*, 2018-0996, p. 18 (La. App. 4 Cir. 5/29/19), --- So.3d ----, *writ denied*, 2019-01166 (La. 10/15/19); 280 So.3d 612.

[4] Jefferson II and Napoleon III were funded by Public Law 110-252 (June 20, 2008) through an appropriation by the United States Congress to the United States Army Corps of Engineers.

[5] The project partnership agreement defined LCPRA as a non-federal sponsor and identified the multiple phases of the SELA project.

[6] Appellant asserts that it was not a party to the federal construction contract to build; rather, USACE and general contractors were parties. Cajun Contractors, LLC, was the general contractor for Jefferson II. Boh Bros. was the general contractor for Napoleon III.

[7] *Sewell*, 2018-0996, p. 1 (La. App. 4 Cir. 5/29/19), --- So.3d ---- 2019 WL 2305673.

residences were located within Jefferson II, which included the construction of new drainage culverts – one along Jefferson Avenue from Carondelet Street to Constance Street and another down Prytania Street from Jefferson Avenue to Nashville Avenue. Lowenburg Appellees' residences were located adjacent to the construction at Jefferson Avenue and Prytania Street.[8] Watson Appellee is located at the intersection of St. Charles Avenue and Napoleon Avenue[9] within Napoleon III, which included the construction of an expanded drainage culvert along Napoleon Avenue from Carondelet Street to Constance Street. Watson Appellee's property is adjacent to the construction on Napoleon Avenue and St. Charles Avenue.

Appellees aver that they were impacted by construction activities[10] from June or July 2013 until December 2016.[11] Lowenburg Appellees alleged that construction activities took place at least five (5) days per week including weekends, began in the early morning, and lasted until the evening. Additionally, Lowenburg Appellees aver that they experienced restricted vehicular and pedestrian traffic[12] to their residences, as well as excessive vibrations, daytime and nighttime noise,[13] dust, dirt, debris, and

---

[8] Three residences were located on Jefferson Avenue, three residences were located in the 5400 block of Prytania Street, and three residences were located in the 500 block of Prytania Street.

[9] Watson Appellee was surrounded by construction activity on both sides.

[10] The trial court took judicial notice that "the general construction activities that took place on the Jefferson II and Napoleon III SELA phases consisted of jet grouting, excavation for the drainage culvert (installation of bracing and removal of soil with dump trucks), culvert backfilling (rebar installation and pouring of concrete), relocation of water mains, installation of catch basins and drain lines, replacement of sewer mains, and removal and restoration of roadways. The SELA Project construction activities on Jefferson II and Napoleon III required the use of backhoes, jackhammers, excavators, cranes, constant loading and movement of dump trucks, and the use of other large equipment. The SELA Project construction activities on Jefferson II and Napoleon III created constant noise, dust, dirt, and blocked access."

[11] John Fogarty, a civil and residential engineer with USACE who served as the administrative contracting officer for the SELA construction, confirmed these dates.

[12] During the construction, Prytania Street was closed and there was tall metal fencing on both sides of the street up to the sidewalks. The residences along Prytania Street were deprived of vehicular access for the duration of the construction project; Appellees were forced to park two (2) to five (5) blocks from their residences. Additionally, other street closures and traffic re-routing substantially impeded Appellees' access to their residences.

foul odors. Watson Appellee alleges that, as a result of the construction activities, the property sustained damage to its foundation, floors, walls, ceilings, roof, and basement. In addition to seeking damages for property damage, Watson Appellee sought compensation for loss of income and profits related to its childcare center.

## PROCEDURAL HISTORY

On January 19, 2016, the Lowenburg Appellees filed their original petition for damages[14] seeking compensation for property damages to residences, loss of use and enjoyment of residences, and lost rent as a result of the construction associated with Jefferson II. On May 21, 2018, through the Third Supplemental and Amended Petition for Damages, Watson Appellee joined as a plaintiff in *M. Langenstein & Sons, Inc. v. Sewerage and Water Board of New Orleans*, a suit similar to the instant suit that involved businesses alleging commercial losses and property damages against Appellant as a result of construction along the Napoleon Avenue Phase II SELA Project. Watson Appellee's claims proceeded to trial with those of the Lowenburg Appellees. All of Appellees' suits alleged that Appellant was liable for damages pursuant to inverse condemnation, strict liability under La. C.C. arts. 667, 2317, and 2317.1, and negligence under La. C.C. arts. 2317 and 2317.1. Appellant filed Third-Party Demands against contractors hired by the USACE to construct the drainage canals and asserted claims based on third party beneficiary and indemnity. In accordance with the Federal Officer Removal Statute, the contractors removed the suit to the United States District Court for the Eastern District of Louisiana. Thereafter, the contractors filed Motions for Summary Judgment and argued that, as

---

[13] The nighttime noise was produced by generators and pumps that operated twenty-four hours per day.

[14] Appellees supplemented and amended their petition three (3) times to add new plaintiffs and claims.

4

federal government contractors, they were entitled to immunity from suit. The federal court, pursuant to *Boyle v. United Tech. Corp.*, 487 U.S. 500 (1988), granted the contractors' Motions for Summary Judgment. Additionally, the federal court dismissed Appellant's third-party demands, declined to retain jurisdiction, and remanded the suit to Civil District Court for the Parish of Orleans.

Appellees' consolidated suit proceeded to trial on January 28 – 31, 2019.[15] On March 21, 2019, the trial court rendered judgment, and found that Appellees had suffered inverse condemnation for which Appellant was liable; that Appellant was the owner of the project; the project's construction caused Appellees' property damages[16], loss of use and enjoyment of properties; and that Appellant failed to show comparative fault as to other parties; and Appellant was strictly liable pursuant to La. C.C. arts. 2317 and 2317.1. The trial court awarded Lowenburg Appellees damages in the amount of $765,084.47.[17] The trial court awarded Watson Appellee damages in the amount of $233,788.00.[18] Appellant now appeals the trial court's March 21, 2019 judgment.[19] Appellees cross-appeal seeking an increase in the amount of damages, judicial interest from the date of judicial demand, and for the fees incurred on appeal.

## DISCUSSION

### *Assignments of Error*

---

[15] The trial court stated that this was the fourth trial before the court on claims raised by homeowners and businesses against Appellant for damages caused by the SELA project.

[16] The construction caused either new damage or exacerbated pre-existing damage to the properties.

[17] This amount included property damages and loss of use and enjoyment. The trial court's award of damages as to each of the Lowenburg Appellee is discussed, in detail, later in this opinion.

[18] This amount included $135,000 for property damages to the church and loss of profits in the amount of $98,788.00 for the daycare center

[19] On July 15, 2019, this Court consolidated the *Lowenburg* and *Langenstein* appeals.

5

On appeal, Appellant raises the following assignments of error:

1. Whether the trial court erred by awarding special damages for loss of use and enjoyment for experiencing noise, vibrations, dust, and property damages;

   a. Alternatively, whether the trial court's awards for loss of use and enjoyment were excessive and thus, an abuse of discretion.

2. Whether the trial court erred by awarding damages for loss of use and enjoyment for general effects experienced throughout the neighborhood caused by construction activities that were minimal and away from the residences;

3. Whether the trial court erred by awarding damages for the impact of alleged construction noises based on potential decibel levels, which was contrary to evidence and the federal court's immunity ruling;

4. Whether the trial court erred in awarding damages for experiencing construction noises at night;

5. Whether the trial court erred by not reducing its award for damages for the stress of living with property damage to comport with its findings regarding property damage;

6. Whether the trial court erred by not reducing the damaged square footage to comport with its reduction of Appellees' property damage claims;

7. Whether the trial court's award of damages for loss of parking and access was excessive;

8. Whether the trial court erred by awarding damages for elements of loss of use and enjoyment contrary to the record; and

9. Whether the trial court's award of damages in favor of Watson Appellee was excessive and not supported by the record.

In Appellees' cross-appeal, they raise the following assignments of error:

1. Whether the trial court's property damage awards in favor of Appellees should be increased;

2. Whether the district court's award for physical damage in favor of Watson Appellee should be increased;

3. Whether the district court erred in not awarding any damages to Mark Hamrick for lost rent;

4. Whether the district court erred in failing to include judicial interest on all damages awarded as mandated by Louisiana law; and

5. Whether Watson Appellee is entitled to fees, including attorney's fees, incurred on appeal pursuant to La. C.C.P. art. 2164 and La. R.S. 13:5112(A).

As illustrated above, both Appellant and Appellees have raised numerous assignments of error. We will discuss the assignments of error by topic – damages, judicial interest, and attorney's fees on appeal.

***Standard of Review***

In *Sewell v. Sewerage & Water Bd. of New Orleans*, a case substantively similar to the instant appeal, this Court explained the applicable standard of review as follows:

> In reviewing a trial court's findings of fact, appellate courts employ a "manifest error" or "clearly wrong" standard of review. *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989) (citations omitted). Regarding issues of law, the standard of review of an appellate court is simply whether the court's interpretive decision is legally correct. *Glass v. Alton Ochsner Medical Foundation*,

[20]02-412, p. 3 (La. App. 4 Cir. 11/6/02), 832 So.2d 403, 405. Accordingly, if the decision of the trial court is based upon an erroneous application of law rather than on a valid exercise of discretion, the decision is not entitled to deference by the reviewing court. Ohm Lounge, L.L.C. v. Royal St. Charles Hotel, L.L.C., [20]10-1303, p. 4 (La. App. 4 Cir. 9/21/11), 75 So.3d 471, 474.

2018-0996, p. 3 (La. App. 4 Cir. 5/29/19), ---So.3d.--- (2019), *writ denied*, 2019-01166 (La. 10/15/19); 280 So.3d 612.

## DAMAGES

### *Inverse Condemnation*

Appellant argues that the trial court erred in awarding Appellees special damages for loss of use and enjoyment for experiencing daytime and nighttime noise, vibrations, dust, and loss of parking, and property damage during the construction because these are quality of life and enjoyment factors that do not constitute a taking; thus, they are properly categorized as general damages.[20] According to Appellant, Lowenburg Appellees' homes were never rendered uninhabitable and use was never lost. Appellant further argues that except for the

---

[20] The Louisiana Supreme Court, in *Wainwright v. Fontenot*, explained:

> The term "damages" refers to "pecuniary compensation, recompense, or satisfaction for an injury sustained." *Fogle v. Feazel,* 201 La. 899, 10 So.2d 695, 698 (1942). The most common type of damages in the delictual context is compensatory damages, which encompasses those damages "designed to place the plaintiff in the position in which he would have been if the tort had not been committed." Frank L. Maraist & Thomas C. Galligan, Jr., LOUISIANA TORT LAW § 7-1 (Michie 1996) (footnotes omitted).
>
> Compensatory damages are further divided into the broad categories of special damages and general damages. "Special damages are those which either must be specially pled or have a 'ready market value,' i.e., the amount of the damages supposedly can be determined with relative certainty." *Id.* § 7-2 (footnotes omitted). . . On the other hand, "[g]eneral damages are those which are inherently speculative in nature and cannot be fixed with mathematical certainty. These include pain and suffering[.]" Maraist & Galligan, *supra,* § 7-2.

2000-0492, pp. 5-6 (La. 10/17/00); 774 So.2d 70, 74.

loss of parking, no other tangible property rights were "taken." In furtherance of this

argument, Appellant relies on *FIE, LLC v. New Jax Condo Ass'n, Inc.*, in which this

Court explained the following:

> As reasoned by this Court in *Chriss*,[21] there is a distinction between a mental anguish claim allegedly related to property damage and a claim for the loss of use of property. A non-economic loss of use occurs when the owner's normal use of the property is restricted by defendant's acts and, consequently, the owner's rights of ownership are disturbed.
>
> The ownership of property includes the rights to possess it, use it, enjoy the use of it, and dispose of it. *See Eagle Pipe and Supply, Inc. v. Amerada Hess Corp.*, [20]10-2267, [20]10-2272, [20]10-2275, [20]10-2279, [20]10-2289, pp. 10-11 (La. 10/25/11), 79 So.3d 246, 258; *Giroir v. Dumesnil*, 248 La. 1037, 1050, 184 So.2d 1, 6 (1966). When any of these rights of ownership are disturbed by an injury or damage to the property through the acts of another, the owner of the property obtains a personal right of action against the one causing the damage. *Eagle Pipe*, [20]10-2267, pp. 42-43, 79 So.3d at 277; *see also*, La. C.C. art. 2315 ("Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."). . . . As such, plaintiffs are entitled to bring a claim against defendants for the damage to their property and to their rights of ownership.
>
> Furthermore, we find the damages claimed for the loss of use of property are compensatory in nature. Compensatory damages are those awarded on the basis of the loss suffered and are designed to replace the loss caused by the wrong or injury. *See McGuire v. Kelly*, *unpub.*, [20]10-0562 (La. App. 1 Cir. 1/30/12), 2012 WL 602366, *16. "Compensatory damages are further divided into the broad categories of special damages and general damages. Special damages are those which have a 'ready market value,' such that the amount of the damages theoretically may be determined with relative certainty." *McGee v. A C And S. Inc.*, 05-1036, p. 3 (La. 7/10/06), 933 So.2d 770, 773. By contrast, general damages include those things which are inherently speculative in nature and cannot be measured definitively in terms of money. *Id.*, [20]05-1036, pp. 3-4, 933 So.2d at 774. Accordingly, loss of intellectual or physical enjoyment, or other loss of lifestyle, fall into the category

---

[21] *Chriss v. Manchester Ins. & Indem. Co.*, 308 So.2d 803 (La. Ct. App.1975).

of general damages because they are inherently speculative and have no measurable monetary value; however, loss of use of property falls within the category of special damages because it can be measured fairly and to a degree of relative certainty by the rental value of substitute property. *See McGee*, [20]05-1036, p. 4, 933 So.2d at 774; *Chriss*, 308 So.2d at 805-06; *see also*, *Nunez v. St. Bernard Parish Fire Dep't*, 519 So.2d 857, 862 (La. App. 4th Cir. 1988).

2016-0843, pp. 13-14 (La. App. 4 Cir. 2/21/18); 241 So.3d 372, 386-87. In *FIE, LLC*, the owners of condominium units sued the condominium association, as well as the association's liability insurer for loss of use as a result of water damage caused by the association's failure to maintain and repair the roof. While this Court, in *FIE, LLC*, categorized loss of physical enjoyment as general damages and loss of use of property as special damages, in the instant consolidated appeal, the trial court awarded damages for loss of use and enjoyment pursuant to inverse condemnation.

In *Holzenthal*, a case substantively similar to the instant case, this Court explained inverse condemnation as follows:

> Every person has the right to acquire, own, control, use, enjoy, protect and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.
>
> Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner . . . . Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question. In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss....
>
> La. Const. Art. I, § 4; cited in *Avenal v. State of Louisiana and Dept. of Natural Resources*, [20]03–3521, pp. 25-26 (La.10/19/04), 886 So.2d 1085, 1103.
>
> The Constitution requires compensation even in those cases in which the State has not initiated expropriation proceedings in accordance with the statutory

scheme set up for that purpose. *State, Through Dept. of Transp. and Dev. v. Chambers Investment Company, Inc.*, 595 So.2d 598, 602 (La.1992).

2006-0796, p. 8 (La. App. 4 Cir. 1/10/07), 950 So.2d 55, 62. Further, this Court, in

*Sewell*, has stated the following:

> La. Const. art. I, § 4(B)(5), as amended in 2006, specifically explains: '[T]he full extent of the loss shall include, but not be limited to, the appraised value of the property and all costs of relocation, **inconvenience, and any other damages actually incurred by the owner**....'" Given that the current constitutional article includes just compensation damages for "inconvenience and other damages actually incurred," the trial court did not err in awarding damages for loss of use and enjoyment of their properties when awarding just compensation. [Emphasis supplied.]

2018-0996, p. 19 (La. App. 4 Cir. 5/29/19), *writ denied*, 2019-01166 (La. 10/15/19);

280 So.3d 612.

This Court, in *Holzenthal*, further explained:

> As the Louisiana Supreme Court noted in Chambers, it is now hornbook law that any substantial interference with the free use and enjoyment of property may constitute a taking of property within the meaning of federal and state constitutions. *Id*.

> The court held:

> Although the legislature has not provided a procedure whereby an owner can seek damages for an uncompensated taking or damaging, this court has recognized the action for inverse condemnation arises out of the self-executing nature of the constitutional command to pay just compensation. The action for inverse condemnation provides a procedural remedy to a property owner seeking compensation for land already taken or damaged against a governmental or private entity having the powers of eminent domain where no expropriation has commenced. The action for inverse condemnation is available in all cases where there has been a taking or damaging of property where just compensation has not been paid, without regard to whether the property is corporeal or incorporeal. *Id*. [Citations omitted.]

> The Louisiana Supreme Court, in its *Avenal* opinion, applied the three-prong analysis set forth in *Chambers*,

11

supra, 595 So.2d at 603 to determine whether a claimant is entitled to eminent domain compensation:

> [T]he court must: (1) determine if a recognized species of property right has been affected; (2) if it is determined that property is involved, decide whether the property has been taken or damaged in a constitutional sense; and (3) determine whether the taking or damaging is for a public purpose under Article I, § 4. Id.; *Constance v. State Through Dept. of Transp. and Development Office of Highways*, 626 So.2d 1151, 1157 (La.1993) (using [La.] C.C. arts. 667 and 668, which impose legal limitations on a landholder's right of ownership, to consider whether property was taken or damaged under Art. I, § 4).

> *Avenal*, supra at pp. 26–27, 886 So.2d at 1104.

*Id.* at pp. 8-9, 950 So.2d at 62–63.

To establish inverse compensation, we must determine whether Appellees have satisfied the three (3) prongs as set out in *Chambers*.

### (1) Whether a recognized species of property right has been affected

In consideration of this first prong, the Louisiana Supreme Court has recognized the following:

> . . . [U]nder Louisiana's Civil Code, "[t]he predominant property right is ownership, which is a complete, free, and exclusive right." See A.N. Yiannopoulos, 2 La. Civ. L. Treatise, Property § 9 (4th ed.2014) (emphasis added).

> Louisiana Civil Code Article 476, appearing in Book II, "Things and the Different Modifications of Ownership," directs: "One may have various rights in things: 1. Ownership; 2. Personal and predial servitudes; and 3. Such other real rights as the law allows." Article 477 of the Civil Code defines "ownership" as "the right that confers on a person direct, immediate, and exclusive authority over a thing." Article 477 further states: "The owner of a thing may *use, enjoy*, and dispose of it within the limits and under the conditions established by law." (emphasis added)

*Faulk v. Union Pac. R.R. Co.*, 2014-1598, pp. 10-11 (La. 6/30/15); 172 So.3d 1034, 1044-45. Additionally, in accordance with the Louisiana Supreme Court, street access is a form of property. *See Constance v. State Through Dep't of Transp. &*

12

*Dev. Office of Highways*, 626 So.2d 1151, 1157 (La.1993). Appellees, as the owners of their respective property, had, among other rights, the rights of use and enjoyment.[22] As the Louisiana Supreme Court concluded in *Chambers*, such rights are both recognized and protected by constitutional provisions. 595 So.2d 598, 604. We find that Appellees satisfy the first prong.

**(2) Whether the property at issue has been taken or damaged in a constitutional sense**

In consideration of the second prong, the Louisiana Supreme Court has explained that "[i]nverse condemnation claims derive from the Taking[s] Clauses contained in both the Fifth Amendment of the U.S. Constitution and Article I, Section 4 of the Louisiana Constitution." *Faulk*, 2014-1598, p. 9 (La. 6/30/15), 172 So.3d at 1044. In the constitutional sense, a taking is "any substantial interference with the free use and enjoyment of property." *Simmons v. Bd. of Comm'rs of Bossier Levee Dist.*, 624 So.2d 935, 949 (La. Ct. App.1993). At trial, Appellees proved that they suffered loss of use and enjoyment of their properties by experiencing noise, vibrations, dust, loss of access, and loss of parking as well property damage.[23] We find that Appellees satisfied the second prong.

**(3) Whether the taking or damage has been for a public purpose pursuant to La. Const. art. I, §4**

In consideration of the third and final prong, the taking or damage of Appellees' property must have been for a public purpose. This Court has already recognized that the instant project was for a public purpose. In *Holzenthal*, this Court

---

[22] This Court considers loss of enjoyment a component of loss of use. *Burmaster v. Plaquemines Par. Gov't*, 2010-1543, p. 9 (La. App. 4 Cir. 3/30/11); 64 So.3d 312, 319.

[23] Later in this opinion we discuss, in detail, Appellees' damages caused by loss of use and enjoyment.

13

concluded that "it is manifestly evident that providing for improved drainage in an area that has often been referred to as the 'bowl' of the city constitutes a valid public purpose. 2006-0796, p. 14 (La. App. 4 Cir.), 950 So.2d at 66. Further, "[t]he purpose of the project was to increase drainage capacity in order to withstand ten-year rainfall events." *Sewell*, 2018-0996, p. 1 (La. App. 4 Cir.), ---So.3d.---. Thus, we find that Appellees satisfied the third prong – the taking and/or damages sustained were for a public purpose.

For all of the aforementioned reasons, we find that Appellees were entitled to damages pursuant to inverse condemnation, and thus we find that the trial court was correct in concluding the same.

### *Custodial Liability Pursuant to La. C.C. arts. 2317 and 2317.1*

The trial court, as well as this Court in *Sewell*, found Appellant liable for damages pursuant to La. C.C. arts. 2317 and 2317.1. Pursuant to La. C.C. art. 2317, "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody." Further, La. C.C. art. 2317.1 modifies La. C.C. art. 2317 to require "proof that: 1) the owner or custodian of a defective thing has knowledge of the defect, 2) the damage could have been prevented by the exercise of reasonable care, and 3) the failure to exercise reasonable care."[24] *Sewell*, 2018-0996, pp. 7-8, ---So.3d---. Pursuant to La. C.C. Art. 2317.1,

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been

---

[24] See *Moffitt v. Sewerage & Water Bd. of New Orleans*, 2009-1596, p. 5 (La. App. 4 Cir. 5/19/10), 40 So.3d 336, 339 (holding Article 2317 was qualified generally by Article 2317.1).

prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

Custodial liability pursuant to La. C.C. art. 2317[25] is limited as to public entities by La. R.S. 9:2800,[26] which requires additional proof that the public entity

---

[25] The Louisiana Supreme Court explained

> It is well-settled law in Louisiana that liability under LA. CIV.CODE art. 2317 is based upon the relationship, i.e., supervision and control, between the person with custody and the thing posing an unreasonable risk of harm to others. Liability is imposed based on custody or garde, not just ownership. *Thumfart v. Lombard,* 613 So.2d 286, 290 (La. App. 4 Cir.), *writ denied sub nom., Montalbano v. Lombard,* 617 So.2d 1182 (La.1993). The fault of the custodian is based upon his failure to prevent the thing under his garde from causing an unreasonable risk of injury to others. *Loescher,* 324 So.2d at 441*; Entrevia,* 427 So.2d at 1146. Rather than the loss falling upon some innocent third person, the loss resulting from the creation of the risk falls upon the person to whom society allots its garde. *Id.* The rationale is the custodian is in a better position than the innocent victim to detect, evaluate, and take steps to eliminate an unreasonable risk of harm which arises from the thing. *King v. Louviere,* 543 So.2d 1327 (La.1989); *Ross v. La Coste de Monterville,* 502 So.2d 1026 (La.1987).

*Dupree v. City of New Orleans*, 1999-3651, p.7 (La. 8/31/00), 765 So.2d 1002, 1008-09.

[26] Limitation of liability for public bodies is set out in La. R.S. 9:2800 and provides:

A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.

B. Where other constructions are placed upon state property by someone other than the state, and the right to keep the improvements on the property has expired, the state shall not be responsible for any damages caused thereby unless the state affirmatively takes control of and utilizes the improvement for the state's benefit and use.

C. Except as provided for in Subsections A and B of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.

D. Constructive notice shall mean the existence of facts which infer actual knowledge.

E. A public entity that responds to or makes an examination or inspection of any public site or area in response to reports or complaints of a defective condition on property of which the entity has no ownership or control and that takes steps to forewarn or alert the public of such defective condition, such as erecting barricades or warning devices in or adjacent to an area, does not thereby gain custody, control, or garde of the area or assume a duty to prevent personal injury, wrongful death, property damage, or other loss as to render the public entity liable unless it is shown that the entity failed to notify the public entity which does have care and custody of the property of the defect within a reasonable length of time.

F. A violation of the rules and regulations promulgated by a public entity is not negligence per se.

G.(1) "Public entity" means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, and employees of such political subdivisions. Public entity also includes housing authorities, as defined in R.S. 40:384(15), and their commissioners and other

had notice and opportunity to repair the defect. Accordingly, to impose custodial liability against a public entity, a plaintiff must prove that (1) the thing which caused the damage was owned or in the custody of the public entity;[27] (2) the thing was defective due to a condition creating an unreasonable risk of harm; (3) the entity had actual or constructive notice of the defective condition yet failed to take corrective action within a reasonable period of time; and (4) the defect was the cause of the plaintiff's harm. Further, "[b]ecause of the limitations set forth in [La] R.S. 9:2800, the duty owed by the [the public entity] under either strict liability or negligence theories is the same." *Moffitt*, 2009-1596, p. 6 (La. App. 4 Cir.), 40 So.3d at 340.[28]

### *(1) The thing which caused the damage was owned or in the custody of the public entity*

As a starting point, as provided by La. R.S. 9:2800(G), "sewerage and water boards and their employees, servant, agents, or subcontractors" are included in the definition of a public entity. As such, Appellant is a public entity. Further, through

---

officers and employees and sewerage and water boards and their employees, servants, agents, or subcontractors.

    (2) "Public site or area" means any publicly owned or common thing, or any privately owned property over which the public's access is not prohibited, limited, or restricted in some manner including those areas of unrestricted access such as streets, sidewalks, parks, or public squares.

[27] "[I]n determining whether a thing is in one's custody or *garde*, courts should consider (1) whether the person bears such a relationship as to have the right of direction and control over the thing; and (2) what, if any, kind of benefit the person derives from the thing." *Dupree*, 99-3651, p. 8, 765 So.2d at 1009. (citations omitted). Determining custody or *garde* of the thing is a fact driven determination. *Dupree*, 99-3651, p. 7, 765 So.2d at 1009 (citation omitted). "Although there is a presumption that an owner has custody or *garde* of its property, this presumption is rebuttable. One way to rebut the presumption is by establishing a contractual undertaking by another to maintain and control the property." *Sewell*, 2018-0996, p. 9, ---So.3d.---.

[28] Further, "[t]hese theories have historically been distinguished on the basis that negligence required a finding of notice, while under strict liability there was no requirement of showing that the defendant knew or should have known of the defect. [citation omitted]. This distinction was eliminated by La. R.S. 9:2800, which requires proof of either actual or constructive notice of a defect before a public entity may be held liable for damages caused by the defect. The requirements are thus now the same for proving either theory. *Moffitt,* 2009-1596, p. 7, 40 So.3d at 340-41.

16

the cooperative endeavor agreement, Appellant had custody of the SELA project, which caused damage to Appellees' properties; thus, satisfying the legal requirement that a public entity owned or had custody of the thing (the SELA project), which caused the damages to Appellees' properties.

**(a) Whether the entity bears such a relationship as to have the right of direction and control over the thing**

In consideration of custody, this Court, in *Sewell*, found that "[Appellant] owned and maintained direction and control over the SELA Project. As previously discussed, [Appellant] owned the SELA drainage systems and was responsible for the design, operation, maintenance, repair and replacement of the SELA drainage system. [Appellant] also participated in monthly meetings concerning SELA construction, as well as received complaints from property owners." 2018-0996, p. 9-10, ---So.3d.---. Similarly, the trial court, in its reasons for judgment,[29] reasoned that Appellant has control and authority over the SELA project because Appellant is responsible for the public drainage system in New Orleans, and Appellant contracted with USACE to engineer and execute the project. The trial court further reasoned that Appellant had access to the work sites and actively participated in the project oversight and construction plan modification. A review of the record reveals that Appellant was responsible for much of the design and execution of the SELA drainage project. The trial court took judicial notice that Appellant is both the owner and controller of the SELA drainage project. We agree, and find that the trial court's conclusion was correct.

---

[29] This Court has explained that "[i]t is a 'well-settled rule that the district court's oral or written reasons for judgment form no part of the judgment, and that appellate courts review judgments, not reasons for judgment.'" *Dawson v. Gray & Gray*, 2018-0380, p. 9 (La. App. 4 Cir. 10/24/18), ---So.3d.---. Further, "[t]he written reasons for judgment are merely an explication of the trial court's determinations." *Id*.

17

### (b) Benefit the entity derives from the thing

The trial court, in its reasons for judgment, reasoned that Appellant derives a benefit because the SELA project's purpose is to improve the public drainage system for which Appellant is responsible. This Court, in *Sewell*, concluded that "there is no dispute that [Appellant], as the entity responsible for public drainage in New Orleans, derived a substantial benefit from the SELA Project." 2018-0996, p. 10, --- So.3d.---.

We find that the construction activities that caused Appellees' harm was controlled by Appellant, a public entity. As such, Appellant satisfied the first prong.

### (2) The thing was defective due to a condition creating an unreasonable risk of harm

The Louisiana Supreme Court explained that "[w]hether a risk is unreasonable is 'a matter wed to the facts' and must be determined in light of the facts and surrounding circumstances of each particular case." *Dupree*, 1999-3651, pp. 13-14, 765 So.2d at 1012. Further, "[t]here is no fixed rule for determining whether the thing presents an unreasonable risk of harm. To assist the trier-of-fact, we note that many factors are to be considered and weighed, including: (1) the claims and interests of the parties; (2) the probability of the risk occurring; (3) the gravity of the consequences; (4) the burden of adequate precautions; (5) individual and societal rights and obligations; and (6) the social utility involved." *Id*.

Prior to the start of the SELA drainage project, Appellant was aware that the construction activities, specifically vibrations, presented a risk of harm to surrounding properties, including that of Appellees. A brochure, made available through a website maintained by Appellant and at public meetings, acknowledged

the potential impact of the construction activities on the surrounding properties. The brochure explained that noise and vibrations from moving and operating heavy equipment could impact structures located within close proximity. The Programmatic Agreement that Appellant signed in April 2010 explained that the SELA drainage project posed a risk of adverse effects to surrounding properties. The Programmatic Agreement also mapped out surrounding structures susceptible to indeterminate damage as a consequence of construction vibrations. Importantly, the Programmatic Agreement provided that construction activities were to be performed in a manner to limit vibrations at the structures nearest the construction activity to a maximum of 0.25 ppv. Vibration monitoring reports for the Jefferson II SELA phase demonstrated that the established threshold of 0.25 ppv was exceeded on forty-four percent of the days of construction. Vibration monitoring reports for the Napoleon III phase demonstrated that the threshold of 0.25 ppv established was exceeded on numerous occasions. The trial court took judicial notice that [Appellant] anticipated adverse consequences to properties near the SELA Project construction due to construction-related vibrations.

Appellant was aware of the risks that the construction activities posed to Appellees' property. However, Appellant permitted construction activities to proceed in a manner that exceeded the permissible threshold, which posed an unreasonable risk of harm to Appellees. Thus, based on the aforementioned, we find that Appellees satisfied this prong.

### (3) The public entity had actual or constructive notice of the defective condition yet failed to take corrective action within a reasonable period of time

19

In consideration of notice, as contemplated by La. R.S. 9:2800, "[a]ctual notice is provided by reporting the defect to a governmental employee who has a duty "either to keep the property involved in good repair or to report dangerous conditions to the proper authorities." *Hanson v. Benelli*, 1997-1467, p. 14 (La. App. 4 Cir. 9/30/98,); 719 So.2d 627, 636. This Court, in *Sewell*, reasoned that

> [p]rior to construction, [Appellant] was aware of the risk and anticipated damages to surrounding property caused from vibrations throughout SELA Project construction. During construction, [Appellant] received reports that the construction vibrations were regularly exceeding a peak particle velocity of .25 inches per second, which was a significant factor in causing property damage. The property owners also reported the issues directly to [Appellant] through its hotline. Furthermore, there is nothing to indicate that the [Appellant] took any corrective measures in the two to four-and-a-half years this project continued. Since [Appellees] established that [Appellant] failed to timely correct the defect after receiving actual notice pursuant to La. R.S. 9:2800, the trial court did not err in finding [Appellant] liable under [La. C.C.] Article[s] 2317 and 2317.1."

2018-0996, p. 11 (La. App. 4 Cir. ), ---So.3d. at --- .

In the instant matter, the trial court took judicial notice that Appellant maintained a hotline whereby complaints about the construction activities were logged. The trial court also took judicial notice that Appellant received numerous complaints of property damages and disturbances from the SELA Project construction on the hotline, and despite these complaints, Appellant failed to take any action to prevent property damage. We find that Appellant had notice of the defective condition, but failed to take corrective action; thus, Appellees have satisfied this prong.

### (4) The Defect was the Cause of the Plaintiff's Harm

The brochure explained that vibrations caused by construction activities could cause damage to Appellees' properties. As discussed, in detail, later in this opinion, Stradford Goins ("Mr. Goins"), an expert in civil and structural engineering who testified on behalf of Appellees, concluded that construction activities caused damage to Appellees' properties. Thus, we find that this prong is satisfied.

For the aforementioned reasons, we find that the trial court did not err in finding Appellant liable pursuant to La. C.C. arts. 2317 and 2317.1.

***Trial Court's Award of Damages***

Both Appellant and Appellees raise numerous assignments of error regarding the trial court's award of damages. Before addressing the substance of these arguments, we list the trial court's awards as follows:

1. Elio, Charlotte, and Benito Brancaforte – 1201 Jefferson Avenue/5351 Coliseum Street

| Property Damage | $35,000.00 |
| Loss of Use and Enjoyment | $48,589.10 |
| Out-of-Pocket Expenses | $1,300.00 |
| Lost Rents | $22,300.00 |
| Total | $107,189.10 |

2. Dr. Josephine Brown – 5524 Prytania Street

| Property Damage | $22,000.00 |
| Loss of Use and Enjoyment | $57,785.40 |
| Out-of-Pocket Expenses | $0.00 |
| Total | $79,785.40 |

3. Robert Parke and Nancy Ellis – 5419 Prytania Street

| Property Damage | $25,000.00 |
| Loss of Use and Enjoyment | $63,892.35 |
| Out-of-Pocket Expenses | $3,900.00 |
| Total | $92,792.35 |

4. Mark Hamrick – 1300-1302 Jefferson Avenue

| Property Damage | $23,000.00 |
| Loss of Use and Enjoyment | $29,901.30 |
| Out-of-Pocket Expenses | $0.00 |

| Lost Rents | $0.00 |
|---|---|
| Total | $52,901.30 |

### 5. Dr. Robert and Charlotte Link – 5534-36 Prytania Street

| Lost Rents[30] | $41,838.00 |
|---|---|
| Loss of Use and Enjoyment | $44,198.00 |
| Out-of-Pocket Expenses | $425.17 |
| Lost Rents | $18,500.00 |
| Total | $104,961.17 |

### 6. Ross and Laurel McDiarmid – 5429 Prytania Street

| Property Damage | $28,000.00 |
|---|---|
| Loss of Use and Enjoyment | $46,967.55 |
| Total | $74,967.55 |

### 7. Jerry Osborne – 5518 Prytania Street

| Property Damage | $30,000.00 |
|---|---|
| Loss of Use and Enjoyment | $54,480.00 |
| Out-of-Pocket Expenses | $5,400.00 |
| Total | $89,880.00 |

### 8. Jack Stolier – 1408 Jefferson Avenue

| Property Damage | $13,000.00 |
|---|---|
| Loss of Use and Enjoyment | $61,992.00 |
| Total | $74,992.00 |

### 9. Dr. William Taylor – 5432-34 Prytania Street

| Property Damage | $24,000.00 |
|---|---|
| Loss of Use and Enjoyment | $63,615.60 |
| Out-of-Pocket Expenses | $0.00 |
| Total | $87,615.60 |

### 10. Watson Memorial Spiritual Temple of Christ – 4400 St. Charles Avenue

| Property Damage | $135,000.00 |
|---|---|
| Lost Profits | $98,788.00 |
| Total | $233,788.00 |

***Loss of Use and Enjoyment***

Appellant raises numerous assignments of error that address the trial court's award for loss of use and enjoyment experienced by Appellees associated with dust, daytime and nighttime noise, vibration, and loss of access and parking as a result of

---

[30] In the trial court's final judgment, "lost rents" is listed twice; this is obviously an error. In the trial court's reasons for judgment, the award of $44,198.00 is for property damage. This is fully addressed later in this opinion.

the construction activities. The crux of Appellant's argument is that the trial court's award for loss of use and enjoyment should be recategorized as mental anguish – Appellant asserts that Appellees are not entitled to damages for mental anguish. Further, Appellant argues that Appellees must tolerate the disturbances and inconveniences of the construction activities pursuant to La. C.C. art. 668.[31] Appellant further argues that because the construction activities were to benefit the public good, the mere inconveniences suffered by Appellees were not compensable. In *Mossy Motors, Inc. v. Sewerage & Water Bd. of City of New Orleans*,[32] another case similar to the instant consolidated appeal, this Court examined whether "construction activity resulted in inconveniences that must be tolerated by the claimant under [La. C.C.] Article 668 or, rather, resulted in more serious inconveniences or interference that may be actionable under [La. C.C.] Article 667."[33] 1998-0495, p. 7 (La. App. 4 Cir. 5/12/99); 753 So.2d 269, 275. In *Mossy*, just

---

[31] La. C.C. art. 668 provides:

Although one be not at liberty to make any work by which his neighbor's buildings may be damaged, yet every one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor.

Thus he who is not subject to any servitude originating from a particular agreement in that respect, may raise his house as high as he pleases, although by such elevation he should darken the lights of his neighbors's [neighbor's] house, because this act occasions only an inconvenience, but not a real damage.

[32] In *Mossy*, plaintiff, a car dealership, filed suit against the New Orleans Sewerage and Water Board for property damage that resulted from the construction of a pumping station. This Court found Appellant strictly liable for damage to plaintiff's property and concluded that the property damage constituted inverse condemnation. SWB was found to be 100% liable for property damage, plaintiff was entitled to compensation for loss of business, SWB was not entitled to contractual indemnity from contractor, and plaintiff was not entitled to damages for mental anguish.

[33] La. C.C. art. 667 provides:

Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him. However, if the work he makes on his estate deprives his neighbor of enjoyment or causes damage to him, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known that his works would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of *res ipsa loquitur* in an appropriate case. Nonetheless, the proprietor

as the instant consolidated appeal, this Court concluded that Appellees suffered taking and or damage to their property that "amounts to more than the mere inconvenience to be tolerated under [La. C.C.] Article 668." *Id.* at p. 8; 753 So.2d at 275.

Appellees assert that Appellant's argument attempts to pick apart expert findings as to loss of use and enjoyment; Appellees assert that Appellant presented no controverting expert testimony. Appellees argue that the trial court's award of damages for loss of use and enjoyment are reasonable, and in some instances, low. We find that Appellant's argument is misplaced and without merit.

This Court, in *Sewell*, reasoned the following:

> The prior version did not define the types of damages to be included as just compensation for the full extent of the loss. The current version of La. Const. art. I, § 4(B)(5), as amended in 2006, specifically explains: "[T]he full extent of the loss shall include, but not be limited to, the appraised value of the property and all costs of relocation, **inconvenience, and any other damages actually incurred by the owner**...." Given that the current constitutional article includes just compensation damages for "inconvenience and other damages actually incurred," the trial court did not err in awarding damages for loss of use and enjoyment of their properties when awarding just compensation. [Emphasis supplied.]

2018-0996, p. 19, ---So.3d.---. Accordingly, while La. Const. Art. I, § 4 "limits [p]laintiffs' recovery to property damages[, it] does not preclude them from recovering damages for the ***loss of use of enjoyment*** of their property, mental anguish, irritation, anxiety, discomfort, and embarrassment under Article 667 or Article 2315." *Arnold v. Town of Ball*, 1994-972, p. 10 (La. App. 3 Cir. 2/1/95), 651 So.2d 313, 321 (emphasis added).

is answerable for damages without regard to his knowledge or his exercise of reasonable care, if the damage is caused by an ultrahazardous activity. An ultrahazardous activity as used in this Article is strictly limited to pile driving or blasting with explosives.

Both Appellant and Appellees called several expert witnesses to opine damages. At trial, Dr. Wade Ragas ("Dr. Ragas")[34] testified on behalf of Appellees as an expert in real estate development, valuation and market analysis, externalities,[35] and loss of use of property.[36] Dr. Ragas noted that Appellees experienced physical property damage, vibrations, dust in the homes, loss of access and parking, and noise. These factors, in addition to the total impact of the construction, contributed to the calculation of damages. Dr. Ragas testified that, as a result of the construction, Appellees suffered a loss of rights[37] of ownership and, therefore, Appellees are entitled to compensation. It is worth noting that while Appellant picks apart Dr. Ragas' findings in relation to the award of damages, Appellant did not present an expert witness to controvert Dr. Ragas' testimony.

At trial, Dr. Rune Storesund ("Dr. Storesund") testified on behalf of Appellees as an expert in geotechnical engineering.[38] Dr. Storesund evaluated the types of damages likely to be produced by the construction. According to Dr. Storesund, the vibration monitoring data collected during construction was incomplete and unreliable; however, Dr. Storesund determined that Appellees experienced excessive vibration and noise.

---

[34] Dr. Ragas also testified in the *Sewell* trial.

[35] Dr. Ragas explained that "[a]n externality occurs when you have a real estate use that is completely consistent with requirements of the law or regulations, but this use is imposed upon it, and in doing so, diminishes the value of the property, and that's an externality that's affecting the property."

[36] Prior to testifying, Dr. Ragas visited each property and interviewed the property owners. He was joined by an engineer for these inspections.

[37] Dr. Ragas outlined the following rights: reasonable expectation of privacy; free of disturbances of a recurring nature affecting their use; exclusive right of use; sale and lease of right of use; safety and security of the premises; a lack of things that could introduce any form of bodily injury; access to their driveways; and no extraordinary noise, vibration, or dust recurring for long periods of time.

[38] Dr. Storesund testified at the *Sewell* trial.

At trial, Dr. James Bob Bailey (Dr. Bailey"), a licensed professional engineer, testified on behalf of Appellant as an expert in structural engineering.[39] Dr. Bailey studied the potential causes of Appellees' property damage. Dr. Bailey considered the properties' age, construction type, and layout, and compared the properties' preconstruction and post-construction condition. Dr. Bailey reasoned that if the property damage was caused by the construction, the properties located nearest the construction activities would have sustained more severe damage, and the extent of property damage should diminish in severity in areas further from the construction activities; instead, the property damage was widespread. Dr. Bailey concluded that the property damage could have been caused by some distress other than the construction activities.

At trial, Dr. David Sykora, a licensed professional engineer, testified on behalf of Appellant as an expert in geotechnical engineering.[40] Dr. Sykora physically inspected Appellees' properties. Dr. Sykora analyzed the ground conditions of each property and reasoned that the properties would settle over time. Dr. Sykora opined that such settlement would have occurred regardless of the construction activities. In summary, Dr. Sykora reasoned that the construction did not cause the property damage; rather settling and other factors caused the damage.

When presented with testimony from numerous expert witnesses,

> [t]he law is well-settled that where the testimony of expert witnesses differs, the trier of fact has great discretion in determining the credibility of the evidence, and a finding of fact in this regard will not be overturned unless clearly wrong. *DeSambourg v. Board of Com'rs for Grand Prairie Levee Dist.,* 608 So.2d 1100, 1108 (La.

---

[39] Dr. Bailey testified at the *Sewell* trial.

[40] Dr. Sykora testified at the *Sewell* trial.

> App. 4th Cir.1992), *affirmed,* 621 So.2d 602 (La.1993),
> citing *A. Copeland Enterprises v. Harimaw, Inc.,* 528
> So.2d 707 (La. App. 5th Cir.1988), *writ denied* 531 So.2d
> 475 (La.1988).
>
> The assessment of credibility of
> competing expert witnesses is best left to the trier of fact,
> who has the opportunity to observe the respective
> demeanor of the witnesses. *Cash v. Charter Marketing
> Co.,* 607 So.2d 1036, 1039 (La. App. 3 Cir.1992).
>
> Where there is evidence before the trier of fact
> which, upon its reasonable evaluation as to credibility,
> furnishes a reasonable basis for the trial court's finding, it
> should not be disturbed in the absence of manifest
> error. *Ardoin v. Evangeline Parish School Bd.,* 376 So.2d
> 372, 373–374 (La. App. 3d Cir.1979).

*Koepp v. Sea-Land Serv., Inc.,* 1993-2562, p. 12 (La. App. 4 Cir. 11/17/94); 645 So.2d 1269, 1276.

At trial, Kevin Vanderbrook,[41] a licensed engineer and owner of VEC Consulting,[42] testified, as a fact witness, on behalf of Appellant. Mr. Vanderbrook had inspected Watson Appellee's roof for damage on three (3) separate occasions: in March 2011 following a hail/windstorm, in August 2012 following Hurricane Isaac, and in May 2016 following a claim for water intrusion that resulted from a rainstorm. At each inspection, he examined both the interior and exterior of the property. Following the 2011 inspection, Mr. Vanderbrook determined that the damage to the interior of the building was caused "[p]rimarily… [by] a lack of maintenance on the roof and the gutter system" that led to "long-term water intrusion."[43] Following the 2012 inspection, Mr. Vanderbrook determined that the roof damage had not been caused by Hurricane Isaac. Instead, he observed that "[e]ssentially, the church was in the exact same condition it was in [during his

---

[41] Mr. Vanderbrook was not tendered as an expert witness.

[42] VECO Consulting is a consulting engineering firm that provides services to the legal and insurance industries.

[43] Mr. Vanderbrook concluded that hail; could not have caused the damage that was present.

previous] inspection from 2011." Mr. Vanderbrook observed no signs of repair since the 2011 inspection. Following the 2016 inspection, Mr. Vanderbrook observed no new roof damage and no signs of repair since his previous inspection in 2012.

The trial court took judicial notice that "the SELA Project construction activities on Jefferson II and Napoleon III created constant noise, dust, dirt, and blocked access."

Appellees Brancaforte testified that the construction activities began in the summer of 2013; the construction activities occurred directly in front of their home, and the intersection of Coliseum Street and Jefferson Avenue was used as a staging area. Appellees Brancaforte also testified that the construction activities ended in late 2016, approximately three and one-half years after it began. During the SELA drainage project, construction activities produced dust, noise, and vibrations. Appellees Brancaforte testified that construction activities began at 7:00 a.m. on weekdays and ended at nighttime; sometimes, construction activities occurred on the weekends. Appellees explained that the noise produced by the construction activities was an aggravation that disrupted their ability to sleep and work from home. Appellees Brancaforte stated that the construction activities produced lots of dust, which irritated their allergies. During the construction, the neighborhood experienced a rodent infestation. Dr. Ragas estimated that Appellees Brancaforte suffered a forty percent loss in monthly rental value. The trial court reasoned that because the nighttime noise was not a daily occurrence, the trial court reduced Dr. Ragas' estimate by five percent. Additionally, because Appellees Brancaforte were away from their property for the majority of the summers, the entirety of 2015, Fall

2016, and Spring 2017;[44] however, Dr. Ragas failed to consider Appellees Brancaforte's absence from the property in his calculations. Thus, the trial court reduced Dr. Ragas' estimate by one-third.

Appellee Brown testified that she began experiencing adverse effects of the construction activities in June 2013; trucks and other construction vehicle would speed down her street, which caused her property to shake and vibrate. Appellee Brown explained that the construction took place directly in front of her property and lasted approximately three and one-half years. Construction activities would begin at approximately 6:45 a.m., when the construction workers would arrive, lasted until the early evening, and would occur on the weekends. Appellee Brown stated that the construction activities would disrupt her sleep. In addition to the vibrations, Appellee Brown also testified that she experienced noise as a result of the construction activities. Appellee Brown stated that she would wear earplugs in an attempt to drown out the constant noise. During the project, generators were brought onsite and operated throughout the night. Because of the noise produced by the construction activities, Appellee Brown's son moved from his bedroom in the front of the house to a bedroom upstairs; this disruption to his routine aggravated his bipolar disorder and he was hospitalized twice during the duration of the construction project. Appellee Brown explained that the construction activities sent dust into her home. Appellee Brown stated that she lost privacy because construction workers would look into her yard. According to Appellee Brown, construction workers neglected to properly store or dispose of their lunches and the city stopped collecting trash, which attracted rodents. A sinkhole developed in front of Appellee Brown's property. Dr.

---

[44] Appellees Brancaforte's absence was due to professional obligations.

Ragas estimated that Appellee Brown suffered a fifty-five percent loss in monthly rental value of her home. While Dr. Ragas estimated that Appellee Brown should be awarded the full amount for nighttime noise, the trial court reasoned that the evidence and testimony provided did not show that nighttime noise was a daily occurrence; for that reason, the trial court reduced Dr. Ragas' estimate by five percent.

Appellees Ellis testified that they were impacted by construction activities beginning July 2013 when their block was used as a staging area for construction; at that point, their property was cut-off by the equipment stored on her block. Their block reopened in late 2016. The construction took place directly outside their property. Appellees Ellis testified that the construction noise was a daily occurrence. Appellees Ellis stated that they could hear the construction workers arrive at 6:30 a.m. each day; construction would end around dark, but would occasionally extend into the night and weekend. In addition to the noise, Appellees Ellis could feel the vibrations in the house. Despite being told, at a community meeting held by Appellant, that construction would last six to nine months, the construction lasted years. Instead of regular trash collection, a large dumpster was placed on the street and the trash remained for weeks at a time; a rodent infestation resulted. In addition to the dumpster, a portable toilet for the construction workers was positioned near her home. Dr. Ragas testified that Appellees Ellis suffered a fifty percent loss in monthly rent value, and awarded the full amount for nighttime noise. Because the trial court reasoned that the evidence did not show that nighttime noise was a daily occurrence, the trial court reduced Dr. Ragas' suggested award for nighttime noise by five percent.

Appellee Hamrick testified that construction activities began near his home in June 2013 and ended in December 2016. According to Appellee Hamrick, construction activities began early each morning and ended after dark and sometimes extended into the night and weekend. Appellee Hamrick stated that he experienced constant noise and vibrations generated by the construction work. Pumps and generators ran throughout the night. Appellee Hamrick testified that he developed difficulty sleeping. As a result of the dust and dirt produced by the construction activities, Appellee Hamrick experienced an upper respiratory infection that ultimately led to a ruptured eardrum. Dr. Ragas estimated that Appellee Hamrick suffered forty percent loss in monthly rent value. In his calculations for loss of use and enjoyment, Dr. Ragas included the square footage of Appellee Hamrick's rental units. Because the square footage of rental units that were also used as rental property were excluded from the calculations for loss of use and enjoyment in *Sewell*, the trial court reduced by one-half the total square footage used in Dr. Ragas' calculation of Appellee Hamrick's loss of use and enjoyment.

Appellees Link testified that the construction activities began in July 2013 and did not end until 2016. Appellees Link explained that construction activities began early in the morning and ended after dark and would sometimes extend into the weekend. Appellees Link complained that they could feel vibration caused by trucks and heavy construction equipment. It was difficult for Appellees Link to sleep and work from home. Generators and pumps operated continuously. At one point, a sinkhole formed. The construction activities produced lots of dust. Dr. Ragas testified that Appellees Link suffered forty-five percent loss in monthly rent value. Dr. Ragas estimated that Appellees Link were entitled to full value for noise, but the

trial court reduced the amount by five percent because the evidence and testimony provided did not show that nighttime noise was a daily occurrence. Although Appellees Link occupied only one side of a double, Dr. Ragas included in his calculations the square footage of both sides of the double even though the other side was used as rental property. In line with *Sewell*, the trial court reduced the square footage by one-half.

Appellees McDiarmid testified that construction activities took place directly in front of their home. Construction activities began in the summer of 2013, and did not end until late 2016. According to Appellees McDiarmid, construction activities began at 7:30 a.m. each morning and would end mid-afternoon; at times, the construction activities would extend into the night and weekend. Generators and pumps operated throughout the night. To combat the noise produced by the construction activities, Appellees McDiarmid would wear earplugs. Because their property was surrounded by construction activities, they could not change internet services or install gas in their home because those service providers could not access their property. As a result of the construction activities, they experienced numerous power outages and their home flooded because the catch basins outside their property had not been properly connected to the main sewer line. Dr. Ragas estimated that Appellees McDiarmid suffered a forty percent loss in monthly rent value. The trial court awarded $46,967.55 for loss of use and enjoyment for forty-one (41) months.

Appellees Osborne testified that they were adversely impacted by the construction activities beginning in June 2014. Appellees Osborne stated that each day, construction activities began at 7:30 a.m., but always ended at different times;

sometimes construction activities lasted into the night and weekend. Appellees Osborne testified that the construction activities generated vibrations and noise. Dr. Ragas estimated that Appellees Osborne suffered a forty percent decrease in monthly rent value. Because the trial court reasoned that evidence proved that Appellees Osborne were impacted by the construction activities for thirty (30) months, not forty (40) months, the trial court adjusted the award accordingly.

Appellee Stolier testified he was adversely impacted by construction activities from summer 2013 until fall 2016; construction took place directly in front of his property. According to Appellee Stolier, construction began each morning around 6:30 a.m. and extended into the night and weekend. Appellee Stolier testified that he experienced noise and vibrations produced by the construction activities. Appellee Stolier also testified that the construction activities produced mud and dirt that would get tracked into his property. According to Appellee Stolier, utility services, such as water and electricity, were shut off intermittently and without warning. Dr. Ragas estimated that Appellee suffered a forty percent decrease in monthly rental value. Because the trial court reasoned that evidence proved that Appellee Stolier was impacted by the construction activities for thirty-six (36) months, not forty-one (41) months, the trial court adjusted the award accordingly.

Appellee Taylor testified that the construction activities took place directly in front of his home began in July 2013 and ended in late 2016. Appellee Taylor also testified that the area near his property was used as a staging area where heavy equipment and construction vehicles constantly traveled. According to Appellee Taylor, construction began each day at 6:30 a.m. and ended at night and would extend into the weekend. Appellee Taylor explained that he experienced noise,

vibration, debris, dust, and dirt produced by construction activities. According to Appellee Taylor, large dumpsters containing construction workers' food and waste caused a rodent infestation in the neighborhood. A sinkhole formed near Appellee Taylor's property. Dr. Ragas estimated that Appellee suffered a forty-five percent decrease in monthly rent value. Dr. Ragas estimated that Appellee Taylor was entitled to the full amount of daytime noise. Because Appellee Taylor worked outside of the home during the day, the trial court reduced the amount by five percent.

### *Loss of Access and Parking*

Appellant argues that the trial court's award for loss of parking and loss of access was excessive.[45] Appellant further argues that the trial court awarded damages for loss of parking based on the square footage of Appellees' homes, which Appellant believes was error because the award should be based on the number of parking spots lost, not the square footage of the property. Appellant also argues that the trial court erred in awarding damages for loss of access. Appellees assert that the trial court only awarded damages for loss of private parking, not public parking. Appellees clarify that the trial court awarded damages for the number of driveway parking spots lost, not the square footage of the property as Appellant asserts. Appellees further assert that Dr. Ragas estimated damages for loss of parking based on the number of driveway parking spots, not the square footage of the home. The trial court took judicial notice that Appellant knew that the quality of life for nearby residents would be disrupted because of the limited access and traffic issues caused by the SELA Project construction.

---

[45] Appellant conceded that driveways on Prytania Street blocked by construction fence may have constituted a taking.

Appellees Brancaforte testified that construction activities began in front of their home in the summer of 2013, continued three and one-half years, and ended late 2016. Appellees Brancaforte explained that, as a result of the construction activities, they had restricted access to their property; cross streets could close and re-open intermittently and without notice. Additionally, their carport was, at times, blocked, which forced Appellees to park elsewhere. The restricted access and parking was difficult for the elderly Appellees Brancaforte. The trial court awarded $48,589.10 for loss of use and enjoyment for a period of forty-one (41) months.

Appellee Brown testified that Prytania Street was closed during construction, which forced her to park on other streets. Appellee Brown explained that intersections were closed and traffic was rerouted, which affected the access to her property. Appellee Brown also explained, that as a result of the construction activities, her driveway buckled. Dr. Ragas suggested an award to Appellee Brown of fifteen percent (15%) for the loss of use of her driveway. However, because the maximum amount awarded for loss of parking in *Sewell* was ten percent (10%), the trial court reduced its award for loss of parking to ten percent (10%).

Appellees Ellis testified that construction activities began in July 2013, and access to their property was almost immediately restricted because construction equipment was stored on their block. Once construction concluded in 2016, their block was one of the last to be reopened. Appellees Ellis further explained that construction took place directly in front of their property, which shut down their street and prevented them from parking at their property. Appellees Ellis testified that they had to park, at the furthest, five blocks from their property and that while their vehicle was parked on side streets, it was struck three times throughout the

35

duration of the construction activities. Appellees Ellis also testified that the impact of the restricted access and parking was magnified at night because the lack of street lights and black construction tarp made it difficult to see and the buckled sidewalks made it difficult to walk. The trial court awarded $63,892.35 for loss of use and enjoyment for a period of forty-one (41 months).

Appellee Hamrick testified that his driveway was often blocked by construction vehicles and construction workers' personal vehicles. Dr. Ragas estimated a ten percent (10%) for loss of use of parking. Because Dr. Ragas admitted that he was unsure whether Appellee loss use of his driveway, the trial court reduced Dr. Ragas' estimated amount to zero.

Appellees Link testified that long-term street closures due to construction activities prevented parking near their home; instead, they were forced to park two to three blocks away. Because Appellees Link's property does not have private parking, the trial court reduced Dr. Ragas' suggested award for loss of parking to zero.

Appellees McDiarmid testified that prior to construction activities, they were able to park in front there home; after construction activities began, they were forced to park on side streets. Twice, their vehicle was struck. Because Appellees McDiarmid did not have private parking, the trial court reduced Dr. Ragas' estimate for loss of parking to zero.

Appellees Osborne testified that, as a result of the construction activities, parking and access to their property was restricted. Appellees Osborne had difficulty transporting their groceries and grandchildren to their home, especially after dark. A sinkhole developed adjacent to Appellees Osborne's property. The trial court

awarded Appellees Osborne $54,480.00 for loss of use and enjoyment for a period of thirty (30) months.

Appellees Stolier testified that construction took place directly in front of their property, the street was dug up on both sides, and traffic was rerouted; as a result, access to their property was severely restricted. According to Appellee Stolier, street parking became competitive and on several occasions they were forced to park blocks from their home. Appellees Stolier explained that the limited access to their home made it difficult for their parents and in-laws to visit and posed safety concerns after dark. The trial court awarded $61,992.00 for loss of use and enjoyment for a period of thirty-six (36) months.

Appellee Taylor testified that construction took place directly in front of his home; although his property had a driveway, he was unable to access it during the duration of the construction. The streets surrounding Appellee Taylor's home were closed, often without warning, during the construction activities. The trial court awarded Appellee Taylor $63,615.60 for loss of use and enjoyment for a period of forty-one (41) months.

"The owner of land abutting a public roadway has a property right of access (ingress and egress) to the roadway. If a public authority substantially interferes with the owner's right of access, the owner has a cause of action under the constitution for just compensation." *State, Dep't of Transp. & Dev. v. Traina*, 537 So.2d 792, 795 (La. Ct. App.1989), writ denied, 540 So.2d 332 (La.1989)

The Louisiana Supreme Court, in *Constance*, explained

> Although our state constitution recognizes that every person has the right to acquire, use and dispose of private property, this right is subject to reasonable statutory restrictions and the reasonable exercise of the police power. La. Const. art. I, § 4 (1989). In fact,

37

general interest takes precedence over that of individuals, and any individual must yield any particular property to the community, should it become necessary for the general use. La. Civ. Code Ann. art. 2626 (West 1952). A landowner's right of ownership is also limited by Civil Code articles 667 and 668, which require that he tolerate some inconvenience from the lawful use of a neighbor's land.

. . .

While property may be taken or damaged by the state or its political subdivisions for public purposes in the exercise of police power, just compensation is constitutionally required. According to *Chambers,* 595 So.2d at 602, the change in La. Const. art I, § 4, which required that the owner in every expropriation shall be compensated for property "taken or damaged ... to the full extent of his loss," revealed a desire to increase the level and scope of compensation beyond that provided by pre-existing state law.

. . .

the landowner's constitutional right to acquire, use and dispose of private property prohibits the state from physically taking or damaging his property without compensation, even for a public purpose.

626 So.2d 1151, 1155-56 (La.1993). Earlier in this opinion, we determined that access to property is a recognized property right and that Appellees sustained a taking or damage, in a constitutional sense, under the theory of inverse condemnation as a result of Appellant's construction activities. Thus, we find that the trial court did not err in awarding damages for loss of access and parking. Because the trial court based its award on the number of months each property was affected, as well as from the evidence presented and the testimony provided, we find that this the trial court did not abuse its discretion and further, the trial court's award was reasonable and not excessive.

### *Property Damage[46]*

---

[46] The trial court took judicial notice that the Jefferson II and Napoleon III SELA phases construction caused new or exacerbated pre-existing damage to the Appellees' properties.

In general, Appellees' assignments of error, in their cross-appeal, address whether the trial court's award of property damage is too low and should be increased.

The Louisiana Supreme Court opined "that in addition to property damages resulting from this inverse condemnation, plaintiffs are also entitled to general damages under Article 2315." *Williams v. City of Baton Rouge*, 1998-1981, p. 10 (La. 4/13/99), 731 So.2d 240, 248. "Landowners are also entitled to recover damages under La.Civ.Code art. 2315 for mental anguish, loss of use, loss of enjoyment, irritation, anxiety, discomfort, and embarrassment when their property is appropriated." *Roy v. Belt*, 2003-1022, p. 10 (La. App. 3 Cir. 2/18/04, 10); 868 So.2d 209, 215. As provided in La. C.C. art. 2315 (A), "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." Further, the Louisiana Supreme Court, in *Roman Catholic Church of Archdiocese of New Orleans v. Louisiana Gas Serv. Co*., explained:

> One injured through the fault of another is entitled to full indemnification for damages caused thereby. *Coleman v. Victo*r, 326 So.2d 344 (La.1976); *Jordan v. Travelers Ins. Co.*, 257 La. 995, 245 So.2d 151 (1971). In such a case, "[t]he obligation of defendant ... is to indemnify plaintiff-to put him in the position that he would have occupied if the injury complained of had not been inflicted on him." Coleman v. Victor, supra, at 346, quoting, *Lambert v. American Box Co.*, 144 La. 604, 613, 81 So. 95, 98 (1919). See also, *Ayala v. Bailey Elec. Co. Inc.*, 318 So.2d 645 (La. App. 4th Cir.1975).
>
> Consequently, "[w]hen property is damaged through the legal fault of another, the primary objective is to restore the property as nearly as possible to the state it was in immediately preceding the damage...." *Coleman v. Victor, supra*, at 346. Accordingly, "the measure of damages is the cost of restoring the property to its former condition. In assessing damage to property, generally, courts have considered the cost of restoration as the proper measure of damage where the thing damaged can be adequately repaired." *Id*. at 346-47, citing *Lambert v.*

39

*American Box Co., supra*; *Hayward v. Carraway*, 180 So.2d 758 (La. App. 1st Cir.1965), writ ref. 248 La. 909, 182 So.2d 662 (1966). "[N]o mechanical rule can be applied with exactitude in the assessment of property damage under Article 2315." *Coleman v. Victor, supra*, at 347, *citing Jordan v. Travelers Ins. Co., supra*.

These basic precepts have been reaffirmed and strengthened indirectly by the Declaration of the Right to Property of our state constitution. Article I, § 4 of the Louisiana Constitution of 1974, in pertinent part, provides:

"Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property.... Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit.... In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss."

Thus, our constitution does not simply require that the owner of condemned or damaged property be compensated with the market value of the property taken and severance damage to his remainder, but that he be "compensated to the full extent of his loss" and "placed in as good a position pecuniarily as [he] enjoyed prior to the taking." *State v. Bitterwolf*, 415 So.2d 196, 199 (La.1982), quoting *State v. Constant*, 369 So.2d 699, 702 (La.1979). Accordingly, justice, reason, and the principle of full reparation of Louisiana Civil Code article 2315 require that where an individual's property is damaged unlawfully by a tortfeasor for no good reason, he be compensated at least as fully as when his property is damaged by the state for a public purpose pursuant to the owner's obligation of citizenship to the community. See La.Civ.Code art. 2626.

618 So.2d 874, 876 (La.1993). The Louisiana Supreme Court rejected the limitation

of a property owner's damage to the lesser of the cost to repair and diminution in

market value caused by the damage at issue.[47] *Id*. The Louisiana Supreme Court

concluded that:

The teachings of the cases approximating Restatement (Second) of Torts § 929 and its comments,

---

[47] This "rigid" method is referred to as the "cost of replacement, less depreciation" test. *Id*.

when applied as flexible guides rather than as arbitrary formulae, tend to foster the same goals established by our Civil Code and state constitutional property damage principles, i.e., they tend to compensate the victim to the full extent of his loss and restore him to as good a position as he held prior to the damage. La.Civ.Code art. 2315; La. Const. 1974, Art. I § 4; *Coleman v. Victor*, supra. Accordingly, we conclude that, as a general rule of thumb, when a person sustains property damage due to the fault of another, he is entitled to recover damages including the cost of restoration that has been or may be reasonably incurred, or, at his election, the difference between the value of the property before and after the harm. If, however, the cost of restoring the property in its original condition is disproportionate to the value of the property or economically wasteful, unless there is a reason personal to the owner for restoring the original condition or there is a reason to believe that the plaintiff will, in fact, make the repairs, damages are measured only by the difference between the value of the property before and after the harm. Consequently, if a building such as a homestead is used for a purpose personal to the owner, the damages ordinarily include an amount for repairs, even though this might be greater than the entire value of the building.

*Id*. at 879-80.

At trial, Mr. Goins testified that he inspected Appellees' properties, and reasoned that vibrations produced by the construction activities caused damage, specifically interior cracking and exterior signs of movement and separation. Mr. Goins prepared estimates of the costs of repair. Mr. Goins testified that through 2018, he examined Appellees' properties to determine the origin and cause of the damages. In his inspections, Mr. Goins visited the properties and interviewed Appellees. Mr. Goins examined the exterior of the properties for signs of distress. Mr. Goins interviewed Appellees to learn the history of the properties. Mr. Goins walked through the interior of the properties and took photographs, and later compared these to pre-construction photographs. At trial, Mr. Goins disclosed that it is normal for homes in uptown New Orleans to have hairline cracks from settling over time, and in the majority of these old homes settling had already occurred. Mr.

41

Goins asserted that there was similar damage among the affected properties: interior cracking throughout, some foundation damage, signs of movement on the exterior as evidenced by large gaps, large separations, some movement in siding. Mr. Goins concluded that SELA construction activities caused damage to Appellees' properties. Mr. Goins provided estimated the cost of repair to Appellees' properties.

At trial, Dr. Sykora testified that he examined pre-construction and post-construction photographs of Appellees' properties as well as construction monitoring data to determine whether the SELA construction activities caused damage – and to what extent – to Appellees' property. Dr. Sykora evaluated the probability of property damage based on vibrations or ppv. Dr. Sykora concluded that "there's essentially no damage" at .25 ppv, which was the contractual threshold. Further, Dr. Sykora opinioned that .5 ppv presents a "more realistic threshold for potential damage" and the probability of damage is "about five [5] percent." Dr. Sykora testified that the vibrations were not continuous and did not cause distress or damage to Appellees' property.

At trial, Dr. Bailey testified that he inspected Lowenburg Appellees' properties to assess interior and exterior distress to the properties and to determine whether the damage was caused by or related to the SELA project as well as the costs of repair. In preparing his estimates, Dr. Bailey analyzed photographs and videos taken both before and after the construction activities. Dr. Bailey concluded that only Appellee Hammick's and Appellee Brown's properties sustained damage attributable to the SELA construction project. Additionally, Dr. Bailey concluded that Watson Appellee's property damage was not caused by the SELA construction project.

Appellant retained Exponent[48] to evaluate the costs of repair of Lowenburg Appellees' property damage. Exponent made site-specific evaluations of Lowenburg Appellees' properties, which included a review of the Jefferson II phase of the SELA construction project and a "crack-by-crack comparison" using before and after photographs of the properties. In preparing the repair cost estimates, Exponent relied on the 2018 Contractors Pricing Guide: Residential Repair & Remodeling Costs with RSMeans data. Overall, the Exponent Report found Mr. Goins' estimates to be excessive.

The trial court took judicial notice that there was consistency and commonality in the damages to Appellees' properties, specifically the widespread cracking and separations, caused by the Jefferson II and Napoleon III SELA Project Construction.

Appellees Brancaforte explained that, as a result of the construction activities, the front porch had separated from the property, there were cracks throughout the basement and in the Tiffany windows, and several doors no longer closed properly; however, pre-construction video showed that there were pre-existing damage to the property. Mr. Goins estimated that it would cost $446,697.36 to repair Appellees Brancaforte's property; this estimate included repairs to the foundation, repainting the entire exterior, repainting several rooms, and the removal and storage of furniture. Contrarily, Dr. Bailey testified that Appellees Brancaforte's property sustained cosmetic distress that pre-existed the construction activities. The Exponent Report estimated the cost of exterior and interior repairs at $12,574.11. The trial court, in its final judgment, after weighing the evidence presented, as well as the

_____

[48] Exponent is comprised of a multi-disciplinary team of engineers that includes both Dr. Sykora, who served as the primary geotechnical engineer, and DR. Bailey, who served as the lead structural engineer, as well as other engineers.

credibility of the competing experts and their recommended awards, awarded Appellees Brancaforte $35,000.00 in property damage.

Appellee Brown reported that, as a result of the construction activities, her driveway buckled, tiles loosened, interior doors no longer closed properly, and cracks formed on the interior and exterior of her property; also, a large "swimming pool" sized sinkhole formed directly in front of her property. Mr. Goins noted cracking throughout the property, signs of porch movement, and damage to the piers. Mr. Goins estimated that it would cost $257,227.63 to repair Appellee Brown's property; this estimate included repairs to the foundation, repainting the entire exterior, repainting several rooms, and the removal and storage of furniture. Dr. Sykora testified that the sinkhole that did not cause damage to the foundation and that there was no damage to the foundation. Both Dr. Sykora and Dr. Bailey agreed that the construction activities damaged the walkway. Dr. Bailey reasoned that except for the walkway, all distress to the property pre-existed the construction activities. The Exponent Report estimated the cost of exterior and interior repairs at $17,348.79. The trial court, in its final judgment, after weighing the evidence presented, as well as the credibility of the competing experts and their recommended awards, awarded Appellees Brown $22,000.00 in property damage.

Mr. Goins observed that Appellee Ellis' property exhibited separations in the front porch, nails protruding from the siding, cracks in the exterior fireplace, and cracks and separation throughout the entirety of the property. Mr. Goins estimated that it would cost $332,995.01 to repair Appellee Ellis' property; this estimate included repairs to the foundation, repainting the entire exterior, repainting several rooms, and the removal and storage of furniture. Dr. Sykora testified that the

property had no sustained and damage to its structure or foundation. Dr. Bailey testified that the property showed both interior and exterior cosmetic damages as well as moisture intrusion. The Exponent Report estimated the cost of exterior and interior repairs at $14,296.58. The trial court, in its final judgment, after weighing the evidence presented, as well as the credibility of the competing experts and their recommended awards,  awarded Appellee Ellis $25,000.00 in property damage.

Mr. Goins testified that there was cracking throughout Appellee Hamrick's property and the stairs had moved away from the property. Mr. Goins reported that the foundation repairs were necessary, but limited to the front porch. Dr. Sykora testified that the widening of the porch was caused by construction activities. Dr. Bailey testified that the property sustained cosmetic distress to the interior and exterior of the property, but the distress, except for the crack in the chain wall, pre-existed the construction activities. Mr. Goins estimated that it would cost $197,328.00 to repair Appellees Hamrick's property; this estimate included repairs to the foundation, repainting the entire exterior, repainting several rooms, and the removal and storage of furniture. The Exponent Report estimated the cost of exterior and interior repairs at $14,397.98. The trial court, in its final judgment, after weighing the evidence presented, as well as the credibility of the competing experts and their recommended awards, awarded Appellee Hamrick $23,000.00 in property damage.

Appellees Link reported that, as a result of the construction activities, there are cracks throughout the interior and exterior of their property, a huge crack on the exterior wall, a large "crevice" in one room, and separations in the kitchen addition. Prior to trial, Appellees Link reattached the bathrooms sinks that had separated from

the wall and fixed broken windows. Mr. Goins estimated that it would cost $317,899.57 to repair Appellees Link's property; this estimate included repairs to the foundation, repainting the entire exterior, repainting several rooms, and the removal and storage of furniture. Dr. Sykora testified that no foundation repairs were necessary. Dr. Bailey testified that the property sustained interior and exterior distress, but the distress pre-existed the construction activities. The Exponent Report estimated the cost of exterior and interior repairs at $41,838.14. The trial court, in its final judgment, after weighing the evidence presented, as well as the credibility of the competing experts and their recommended awards, awarded Appellees Link $41,838.00 in property damage.

Appellees McDiarmid explained that, as a result of the construction activities, their property experienced power outages and flooding because the catch basins outside the property had not been connected to the main sewer line. Mr. Goins estimated that it would cost $370,536.43 to repair Appellees McDiarmid's property; this estimate included repairs to the foundation, repainting the entire exterior, repainting several rooms, and the removal and storage of furniture. Dr. Sykora testified that the property's piers exhibited separation that pre-existed the construction activities and foundation repairs were not necessary. Dr. Bailey testified that the property's distress pre-existed the construction activities. The Exponent Report estimated the cost of exterior and interior repairs at $15,759.05. The trial court, in its final judgment, after weighing the evidence presented, as well as the credibility of the competing experts and their recommended awards, awarded Appellees McDiarmid $28,000.00 in property damage.

Appellees Osborne reported cracks and separations throughout the property, the left side of the property now bulges because one of the piers has collapsed. Buckling floors, and the upstairs balcony has separated from the property, which caused water intrusion. Prior to trial, Appellees Osborne repaired some of the aforementioned damage. Mr. Goins observed cracking throughout the property and a bump in the floor consistent with a damaged pier. Mr. Goins estimated that it would cost $383,809.17 to repair Appellees Osborne's property; this estimate included repairs to the foundation, repainting the entire exterior, repainting several rooms, and the removal and storage of furniture. Dr. Sykora testified that the construction activities did not cause damage to the property's foundation, and structural repairs were not necessary. The Exponent Report estimated the cost of exterior and interior repairs at $19,683.75. The trial court, in its final judgment, after weighing the evidence presented, as well as the credibility of the competing experts and their recommended awards, awarded Appellees Osborne $30,000.00 in property damage.

Appellee Stolier admitted that, prior to the SELA construction project, his property evinced minor cracks; however, those cracks have increased in length and now there are cracks throughout the property. According to Appellee Stolier, his recently installed bathroom tile have popped up and recently remodeled kitchen has separated from the walls and counters. Mr. Goins observed damage to roof tiles, damage to the exterior pool area, and nails protruding from the siding. However, unlike the other properties at issue, Appellee Stolier's property did not require foundation repairs. Mr. Goins estimated that it would cost $79,677.44 to repair Appellee Stolier's property. Dr. Sykora testified that the construction activities did not damage the property. Dr. Bailey testified that he observed exterior and interior

damage to the property, but this damage pre-existed the construction activities. The Exponent Report estimated the cost of exterior and interior repairs at $7,790.02. The trial court, in its final judgment, after weighing the evidence presented, as well as the credibility of the competing experts and their recommended awards, awarded Appellee Stolier $13,000.00 in property damage.

Appellee Taylor testified that, as a result of the construction activities, his property has cracks in almost every room, the corner of the property and porch are subsiding, separations in the molding and baseboards, a banister has cracked, and the ceiling in one room is collapsing inward. Appellee Taylor performed some repairs and provides those costs. Mr. Goins estimated that it would cost $292,604.78 to repair Appellee Taylor's property; this estimate included repairs to the foundation, repainting the entire exterior, repainting several rooms, and the removal and storage of furniture. Dr. Sykora testified that Appellee Taylor's property did not have foundation issues. Dr. Bailey testified that both the interior and exterior distress to the property pre-existed the construction activities. The Exponent Report estimated the cost of exterior and interior repairs at $23,411.16. The trial court, in its final judgment, after weighing the evidence presented, as well as the credibility of the competing experts and their recommended awards, awarded Appellee Taylor $24,000.00 in property damage.

Watson Appellee testified that, as a result of construction activities, the property sustained bowing foundation; cracked tiles, walls, and ceiling; basement flooding; and roof damage. At trial, it was noted that Watson Appellee had sustained roof damage prior to the construction as evidenced by three separate insurance claims. Mr. Goins estimated that it would cost $846,651.98 to repair Watson

48

Appellee's property. The trial court, in its reasons for judgment, noted that while the construction may have exacerbated the damage, preconstruction video and photographs demonstrated that much of the property damage was sustained prior to the construction. The trial court, in its final judgment, after weighing the evidence presented, as well as the credibility of the competing experts and their recommended awards, awarded Watson Appellee $233,788.00 in property damages.

In consideration of a trial court's award of damages, this Court reasoned

> The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. *Davis v. Hoffman*, [20]00-2326, pp. 3-4 (La. App. 4 Cir. 10/24/01), 800 So.2d 1028, 1030-31. In effect, the award must be so high or so low in proportion to the injury that it "shocks the conscience." *Id.* (quotation omitted). Where dealing with specific awards made for specific reasons spelled out by the trial court, we must consider whether each specific item is recoverable as a matter of law. *Mistich v. Volkswagen of Germany, Inc.*, [19]94-226, p. 4 (La. App. 4 Cir. 6/25/97), 698 So.2d 47, 50.

*Sewell*, at p. 16.

This Court, in *Sewell* and consistent with the jurisprudence, concluded that Appellees were "entitled to be compensated to the full extent of [their] loss." 2018-0996, p. 20, ---So.3d---. As such, the trial court did not err in its award of damages to each Appellee, even though it may not have been what their experts suggested. After weighing the credibility of the expert witnesses, and their damage reports, the trial court compensated Appellees' for the full extent of their losses.

### *Lost Rent*

On appeal, Appellee, Mark Hamrick ("Appellee Hamrick"), argues that the trial court erred in failing to award damages for lost rent. Appellee Hamrick owns a four-plex property located at 1300-02 Jefferson Avenue; he resides in two of the

units and rents the remaining two units. Appellee Hamrick testified that he was impacted by the construction beginning in June 2013 until December 2016. As a result of the construction, Appellee Hamrick argued that there was a seventeen month vacancy, from November 1, 2014 to March 31, 2016, and he was unable to find a tenant willing to pay $1,750.00 per month. Appellee Hamrick asserts that, as a result of the construction, he lost rent in the amount of $29,750.00. The trial court, in its reasons for judgment, highlighted that on cross-examination, Appellee Hamrick conceded that he had been performing work on the unit from 2014 to 2016, and did not advertise the unit for lease until January 2016; he secured a tenant in April 2016. Further, Appellee Hamrick testified that that he had attracted the interest of prospective tenants, but he refused them because they sought a lower rental price. For those reasons, the trial court concluded that Appellee Hamrick did not sustain a loss in rents because of the construction and did not award him any damages for lost rent. Thus, we find that the trial court did not abuse its discretion.

### *Judicial Interest*

As an assignment of error, Appellees argue that judicial interest should be added onto all damages awarded. The trial court's judgment is silent as to interest. Pursuant to La. C.C.P. art. 1921,[49] "[t]he court shall award interest in the judgment as prayed for or as provided by law." This Court explained that "[t]he Louisiana Code of Civil Procedure also provides for mandatory legal interest." *Lifetime Const., L.L.C. v. Lake Marina Tower Condo. Ass'n, Inc.*, 2012-0487, p. 11 (La. App. 4 Cir. 3/27/13), 117 So.3d 109, 117. The Louisiana Supreme Court explained that "[t]he

---

[49] The official comment to La. C.C.P. art. 1921 provides that the phrase "as provided by law" contemplates torts claims because judicial "interest attaches automatically, without being prayed for.

Legislature could not have selected stronger or more significant language than the words 'shall attach' to indicate an intention that interest automatically becomes due and payable on a judgment sounding in damages from the date of judicial demand,[50] irrespective of whether or not it is prayed for in the petition or mentioned in the judgment." *Grennon v. New Orleans Pub. Serv.*, 17 La. App. 700, 701, 136 So. 309, 310-11 (1931). As such, we amend the trial court's judgment to include judicial interest from the date of the trial court's final judgment.

### *Attorney's Fees*

As an assignment of error, Appellees argues that, on appeal, they should be awarded $25,000 in attorney's fees and costs. In its final judgment, the trial court awarded Appellees "reasonable attorney's fees"[51] and "taxed [Appellant] with the costs associated with the prosecution of this matter."[52] On appeal, "[a]n increase in attorney's fees is usually awarded where a party who was awarded attorney's fees by the trial court is forced to and successfully defends an appeal." *State Dep't of Transp. & Dev. v. Brookhollow of Alexandria, Inc.*, 578 So.2d 558, 564 (La. Ct. App. 1991), 578 So.2d 558, 564. Further, "[t]he award of additional attorney fees is 'to keep the appellate judgment consistent with the underlying judgment.' *Goulas v. B & B Oilfield Services, Inc.*, [20]10–934 (La. App. 3 Cir. 8/10/11), 69 So.3d 750, 762, writ denied, 11–1951 (La.11/14/11), 75 So.3d 945. To determine the amount of

---

[50] The Louisiana Supreme Court explained that the date of judicial demand contemplates that "until rendition of a judgment, no sum is due to either party upon which to award interest." *Cajun Elec. Power Co-op. v. Owens-Corning Fiberglass Corp.*, 616 So.2d 645, 647 (La.1993).

[51] "The trial court is authorized to assess attorney fees pursuant to La. R.S. 13:5111(A)." Sewell, 2018-0996, p. 21 (La. App. 4 Cir. 5/29/19), ---So.3d.---.

[52] "The language of the statute indicates that the legislature intended such an award for attorney's fees to be permissible. However, in making an award for attorney's fees, the trial court is vested with much discretion and the award will not be disturbed in the absence of a clear abuse of that discretion." *State Dep't of Transp. & Dev. v. Brookhollow of Alexandria, Inc.*, 578 So.2d 558, 564 (La. Ct. App.1991.

attorney's fees, factors that are considered include 'the skill exercised by the attorney and the time and work required on appeal.' *Avenue Surgical Suites v. Jo Ellen Smith Convalescent Center*, [20]11–0026 (La. App. 4 Cir. 5/18/11), 66 So.3d 1103, 1111." *State, Dep't of Transp. & Dev. v. Monteleone*, 2011-1013, 34 (La. App. 5 Cir. 11/13/12); 106 So.3d 153, 174.

The trial court awarded attorney's fees in favor of Appellees, and Appellees successfully defended the appeal raised by Appellant. For those reasons, we find that Appellees are entitled to reasonable attorney's fees on appeal. However, in the instant appeal, we are unable to conclude from the record the appropriate amount of additional attorney's fees to be awarded. Accordingly, we remand this matter for a hearing on the issue of attorney's fees for this appeal.

### *Judgment*

As noted above, a review of the trial court's final judgment, particularly its award in favor of Appellees Dr. Robert and Charlotte Link -5534-36 Prytania Street, revealed two line items for "Lost Rent." The first "Lost Rent" line item provided the amount of $41,838.00. The second "Lost Rent" line item provided the amount of $18,500.00. This is obviously an error. The trial court, in no other award, lists duplicative line items. While it is well-settled that "written reasons for judgment form no part of the judgment, and that appellate courts review judgments, not reasons for judgment," a court of appeal is permitted to utilize a trial court's written reasons for judgment "to gain insight into the district court's judgment." *Wooley v. Lucksinger*, 2009-0571, p. 77 (La. 4/1/11), 61 So.3d 507, 572; *Bottinelli Real Estate, L.L.C. v. Johns Manville, Inc.*, 2019-0619, pp. 10-11 (La. App. 4 Cir. 12/27/19), 288 So.3d 179, 187. A review of the trial court's written reasons for judgment reveal that

the award in the amount of $41,838.00 is for property damage, and the award in the amount of $18,500.00 is for lost rent.

Although this issue was not raised on appeal by either Appellant or Appellees, it is "[w]ithout doubt, [that] an appellate court has the authority to raise an issue *sua sponte* on appeal." *Wooley*, 2009-0571, p. 62 (La. 4/1/11); 61 So.3d at 562. Further, this Court explained that

> "an appellate court ... has the constitutional and statutory authority to raise an issue *sua sponte* on appeal when justice requires it to do so." *Id*. In addition, La. C.C.P. art. 2164 provides that "[t]he appellate court shall render any judgment which is just, legal, and proper upon the record on appeal." "As noted in the Official Revision Comments under Art. 2164, the appellate court has 'complete freedom to do justice on the record irrespective of whether a particular legal point or theory was made, argued, or passed on by the court below.'" *Georgia Gulf Corp. v. Board of Ethics for Public Employees*, [19]96-1907, p. 6 (La. 5/9/97), 694 So.2d 173, 176.

*Keeping Our Legacy Alive, Inc. v. Cent. St. Matthew United Church of Christ*, 2017-1060, pp. 13-14 (La. App. 4 Cir. 10/31/18), ---So.3d---. For those reasons, we modify and render the trial court's judgment to read "Property Damage $41,838.00" for Appellees Dr. Robert and Charlotte Link.

## DECREE

For the aforementioned reasons, we amend the trial court's judgment to include judicial interest from the date of judicial demand, remand for a hearing on attorney's fees on appeal, modify and render the trial court's judgment to read "Property Damage $41,838.00" for Appellees Dr. Robert and Charlotte Link, and affirm as amended.

**AMENDED, REMANDED, MODIFIED AND RENDERED, AND AFFIRMED AS AMENDED**